**UNITED STATES of America, Plaintiff,**

v.

**Manuel Mendez CRUZ, Defendant.**

**Civ. No. 93–CR–137B.**

United States District Court,
D. Utah, C.D.

Nov. 22, 1993.

Bruce C. Lubeck, Tiffany M. Romney, U.S. Attorney's Office, Salt Lake City, UT, for plaintiff.

Solomon J. Chacon, Salt Lake City, UT, for defendant.

## ORDER

BENSON, District Judge.

This is before the court on the defendant's Objection to the Magistrate Judge's Report and Recommendation. The defendant objects to the Magistrate Judge's denial of his Motion to Suppress Evidence resulting from the search of his home.

The court having reviewed the file including the briefing filed in support of and in opposition to the Motion to Suppress, the Objection to the Report and Recommendation, and the transcript of the hearing on the Motion to Suppress, and having reviewed *de novo* the Report and Recommendation of the Magistrate Judge, finds that the Magistrate Judge's Report and Recommendation is supported by the facts and the law.

The court adopts the Magistrate Judge's Report and Recommendation. The Motion to Suppress is DENIED.

IT IS HEREBY ORDERED.

## REPORT AND RECOMMENDATION

BOYCE, United States Magistrate Judge.

The defendant, Manuel Cruz, made a motion to suppress evidence seized by police from his premises on the grounds the evidence was obtained in violation of the Fourth Amendment (File Entry 11). A memorandum was submitted by Cruz in support of the motion. The government made a response (File Entry 13) and filed a more formal memorandum. Also, at issue in the case, at the time of the hearing on the motion, was whether a statement made by the defendant was taken in violation of his *Miranda*[1] rights. Hearing was held on the motion on August 19, 1993. On August 27, 1993 the government filed an additional memorandum (File Entry 19). The defendant submitted a post hearing memorandum (File Entry 21).

A hearing on the motion to suppress was held on August 19, 1993. The case has been referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B). This report and recommendation is submitted pursuant to the reference on the defendant's motion to suppress.

Tracy Harper, a West Valley City, Utah police officer with the Metro Narcotics Strike Force, testified that on April 15, 1993 he was involved in the search of a residence at 516 Leona Lane in Murray, Utah. The residence was that of the defendant Cruz. The officer went to the residence to serve an arrest warrant on Cruz for distribution of cocaine (Tr. p. 7). Sergeant Brad Blair was with Harper along with officers Metcalf and Snyder. Harper and Blair went to the front door. The two other officers were to the rear of the premises.

The officer knocked on the door and spoke to a white male, Ian Martin, who answered the door. Harper asked if Manuel [defendant] was there (Tr. p. 8). Martin said Manuel Cruz was there. The officers were dressed in tank tops and shorts. Harper said they were neighbors and Martin yelled up the stairs to Manuel that "your neighbors want to talk to you." (Id.). Defendant yelled back to "tell them I'm busy." At that point the officer showed Martin a badge and said they needed to talk to Manuel (Tr. pp. 8–9). Martin ran up the stairs and came down the stairs first. A few minutes later defendant Cruz came down the stairs (Tr. p. 9). The arrest warrant was never served because the officers suspected drugs were in the residence and the arrest warrant would only authorize the defendant's arrest. The officers decided to do a "knock and talk."[2] This is a noncustodial procedure where the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence (Tr. p. 9).

Before defendant came to the door the officer noticed others in the downstairs livingroom. When defendant came to the doorway the officer introduced himself. The officers were outside the doorway (Tr. p. 10). Harper said the officers were with Metro Narcotics and that they didn't necessarily want to talk in front of defendant's company. The people in the living room immediately stood up, said "that's fine, we'll leave." They were not asked to leave but they left immediately by the back door (Tr. pp. 10–11). After the guests left, Harper asked defendant if the officers could talk to him in his living room area. Defendant invited the officers in and down to the livingroom (Tr. p. 11). The officer asked defendant if he had heard of the President's "war on drugs" and defendant said he had not. Harper asked defendant if he used drugs and defendant said no. The officer asked if he had drugs in the home and defendant said no. The officer said "then you wouldn't mind if we searched the home." The defendant replied "no, not at all" (Tr. p. 12). The conversation was in English (Id.). There was no indication the defendant did not understand what was requested or what was being said (Tr. p. 13). Harper said that in order to search the home he would have to

---

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** From the activity of knocking on a suspect's door and talking about drugs.

stay with the defendant and he would have a couple of other officers assist with the search. Sergeant Blair asked the other officers, who were outside at the rear of the house, to come in. These were detectives Metcalf and Snyder of Metro Narcotics (Id. p. 13). Defendant was not handcuffed, threatened, or told he would be arrested. The arrest warrant for the defendant was never shown to him (Tr. p. 14). At that point, detective Metcalf asked defendant if it was okay to search and defendant replied "yeah, no problem" (Tr. p. 14). Defendant never objected to the search and spoke to Metcalf in English. While the other detectives searched, Harper talked to defendant. The conversation was in English (Tr. p. 15). The search lasted for about ten to fifteen minutes before drugs and weapons were found, thereafter, a much longer search for about two hours occurred (Tr. p. 16). Other drugs were found.

After awhile, Harper conducted a tape recorded interview with the defendant (Id.). At some point during the interview, defendant was handcuffed because guns had been found in the residence (Tr. p. 17). After some initial small talk, the defendant was given a *Miranda* warning (Tr. p. 18). A transcript of the conversation (Def. Exh. B) reflects the warning was as follows (Def. Exh. A):

Harper: Are you aware of your Miranda? Do you know what Miranda is? Miranda rights, your rights? You heard 'um read 'um maybe on T.V. when someone says, You have the right to remain silent?

Cruz: Mm-mm.

Harper: You have the right to an attorney. If you can't afford an attorney, we will appoint an attorney for you.

Cruz: Yeah.

Harper: You have that right before any type of questioning.

Cruz: Mm-mm.

Harper: After you've been formally charged. Now, I've explained to you what your charges are going to be on this case for the cocaine, for the weapons, distribution type cocaine case. Uhm, and it, with me explaining your rights, and having your rights in mind, do you want to talk to me about this?

Cruz: Now, what do you mean, I wanna talk to ya?

The interview was in English (Tr. p. 18) The officers did not have a search warrant for the premises. The officers did not have sufficient information for a search warrant (Tr. p. 22). They merely had a suspicion that drugs were at defendant's residence and hoped to get his consent to search (Id.). No consent form was executed. The consent to search was not recorded (Tr. p. 24). Part of the reason for going to the residence was to apprehend defendant (Tr. p. 25). Officer Harper drew his weapon after Ian Martin opened the door. This is not uncommon in drug cases (Tr. p. 26). The officer was not a neighbor of defendant. The officer drew his weapon as defendant was rounding the corner of the bedroom. The officers were still outside on the porch area (Tr. p. 27). When defendant arrived the gun was reholstered. It did not "clear leather." The weapon was not actually fully drawn from the holster (Tr. p. 46). The officer didn't think defendant saw it. The officer reached for his gun only because the defendant had pulled out or pushed in an antenna on a phone which sounded like the slide action on a weapon (Tr. p. 28). He did not know what happened to the phone Cruz had (Tr. p. 46). Defendant was never touched by the officers before entry. Defendant did become pale and sweaty at a later time (Tr. p. 30). Defendant's demeanor was one of alarm about the officers' presence. When asked if the officers could search his apartment, defendant stated, "go ahead" (Tr. p. 31). This was the officer's normal way of asking the question (Tr. p. 32). The officer felt the important thing was to state the word "search." After receiving consent to search from the defendant, Officer Metcalf came in and was introduced to the defendant. Metcalf asked if defendant was sure he didn't have any problem with the officers searching the apartment (Tr. p. 33). In a short time, the officers conducting the search found cocaine and guns (Tr. p. 34). The searching officers called Officer Harper to see what they had found. Defendant was not handcuffed at this

time but he was not free to leave. Defendant was in "custody" at that time in the opinion of the officer. If defendant had tried to leave he would have been arrested (Tr. p. 35). Defendant never asked the officers to stop the search.

Prior to going to defendant's residence there had been prior purchases of drugs from defendant (Tr. p. 43).

Sergeant Brad Blair of the Utah Division of Investigations (UDI) testified (Tr. p. 47). He was involved in the search of defendant's residence. The officers went to defendant's house to execute an arrest warrant. It was never served. On arrival at the premises, Blair and Metcalf went to the front door and a white male answered. The individual was told they needed to talk to defendant. They said they were from the police department and they would like to talk to defendant (Tr. p. 48). The white male went upstairs and brought the defendant back to the door. They told defendant they would like to talk to him. They went inside the house and other persons, once they found out it was the police, left by the backdoor (Tr. p. 49). Harper told the defendant they had had drug complaints and asked if defendant used drugs. Defendant said no (Id.). Harper then asked if it was okay to search the residence and defendant said fine (Tr. p. 50). Blair then went upstairs where he found drugs and weapons. He first invited the other officers, who were outside, to come in (Id.). The conversation was in English and defendant answered in English (Tr. p. 51). The communication was satisfactory and defendant spoke English very well. The defendant was not threatened and did not ask that the search be stopped (Tr. pp. 51–52).

When the officers first went to the premises, they first told Ian Martin they were neighbors (Tr. p. 53). Blair did not see Harper draw his gun. The defendant was very nervous (Tr. p. 54).

Stephen J. Metcalf, a detective with the Metro Narcotics Strike Force, testified (Tr. p. 55). On April 15, 1993 he was involved in the search of defendant's residence. There was an outstanding arrest warrant for defendant. Metcalf and Detective Snyder went to the rear of the premises. Three individuals left the premises and got into vehicles (Tr. p. 57). Harper told the detectives, who were in the back, to enter the house and that defendant had given consent to search the premises. Metcalf looked at the defendant and asked if that "was right, you're going to let us look around, you don't have problem with that." Defendant said "no, go ahead" (Tr. p. 57). Metcalf asked the defendant in order to reassure Metcalf. (Id.). He was dressed in levis with a polo shirt (Tr. pp. 57–58). The defendant spoke in English. Metcalf had a casual conversation in English with the defendant. Defendant appeared to understand and be responsive (Tr. p. 59). Defendant never asked that the premises search cease (Id.).

Prior to going to defendant's home, the officers determined to do a "knock and talk" (Tr. p. 60). That was because the officers had been investigating defendant for narcotics trafficking and they wanted to see if he would consent to a search (Tr. p. 61). Metcalf asked for the additional or second consent from defendant so that if the matter went to court, Metcalf could say with confidence that defendant understood and gave permission for the search (Tr. pp. 61–62). Defendant said to Metcalf that he didn't object to a search and go ahead and take a "look around if you want" (Tr. p. 63).

Defendant Manuel Cruz testified (Tr. p. 645). He testified he did not invite the police into his apartment. Ian Martin called upstairs to defendant and said the neighbors were asking for him. He told Martin to say he was busy. Thereafter Martin went upstairs and said the police were at the door asking for the defendant. Defendant went downstairs cause he wanted to know what was happening. He did not have a telephone with him (Tr. p. 65). When defendant got downstairs one of the policemen took out his gun and pointed it at defendant. The defendant was scared and went outside because the officer said they wanted to talk to him (Tr. p. 66). When defendant was outside, each officer grabbed his arm on each side and threw defendant back inside. The officers said they wanted to speak with him in private. They went downstairs next to the kitchen (Id.). Defendant did not ask the

officers to leave (Tr. p. 67). Other people in the apartment left when they found it was the police. The defendant was nervous and scared. Defendant didn't remember if anything was said about a war on drugs (Tr. p. 68). An officer asked if Cruz used drugs and he said he didn't. Defendant told the officer there were no drugs in the house. The defendant, when asked if the officers could search his house, said no. He did not give permission for the officers to search his house (Tr. p. 69). Defendant did not remember if officer Metcalf asked if defendant had a problem with officers looking around. Defendant was never told he could leave the apartment (Id.).

The officers spoke to plaintiff in English and defendant understood the questions about search but they did not ask about looking around (Tr. pp. 72–73). Defendant did not attempt to stop the search (Tr. p. 74).

Based on the above evidence, the court enters the following:

### Findings of Fact

1. On April 15, 1993 Officers Tracy Harper, Brad Blair and two other officers of the Metro Narcotics Strike Force went to the defendant's residence at 516 Leona Lane, Murray, Utah. The officers had an arrest warrant in their possession for defendant Manuel Cruz for a felony drug violation. The defendant had previously sold narcotics to police agents. The officers believed that the defendant Cruz had drugs in his premises, however, the officers did not have probable cause to obtain a search warrant to search the premises.

2. Before going to the defendant's premises, the officers decided to do a "knock and talk" procedure where the officers would not execute the arrest warrant but would knock on the premises and seek to enter to talk to the defendant and obtain consent to search the premises, thereby obviating the need to obtain a search warrant and allow a more expansive search than would be lawful pursuant to an arrest of defendant.

3. Officers Harper and Blair went to the front door of defendant's premises. They were not in uniform but in casual civilian clothes. They knocked on the door and a white male, Ian Martin, answered the door. Officer Harper asked if defendant was present and received an affirmative reply from Martin. The officer said they were neighbors and asked to see the defendant to talk to him. Martin moved away from the door and spoke to defendant and told him that some neighbors wanted to speak to him. Defendant Cruz told Martin to tell them he was busy. Martin told the officers what defendant Cruz had said and Officer Harper displayed his badge and said they were police officers and needed to speak to defendant. This was relayed by Martin to the defendant. The defendant came down from the upper level of a split level unit. As he came down towards the door he had a radio or portable telephone. He pushed the areal in which sounded like the slide on a weapon. Harper drew a pistol just loose from its holster but not out of the holster. Defendant probably did not see the weapon. When defendant came to the door the weapon was replaced fully in Harper's holster. Harper identified himself and Officer Blair as police officers and said they would like to speak to defendant and asked if they could come in and talk to him. The defendant was inside the premises, the officers were outside. The officers did not grab or touch the defendant. They did not push Cruz into the premises or point a weapon at him. The officers did not display the arrest warrant or claim any legal authority to enter the premises but were voluntarily admitted into the premises by defendant. The officers had a legal right to enter the premises without the defendant's permission based on the arrest warrant but they did not exercise that right or declare it to defendant.

4. When the officers entered the premises there were other persons present in the living room area. On hearing that the officers were police, the other persons left the premises by the backdoor. They were not requested to leave. Officers Harper, Blair and the defendant went into the living area and Harper spoke to the defendant. Harper asked defendant if he was aware of the President's War on Drugs. Cruz said he was not. Harper asked Cruz if he used drugs and he replied no. Officer Harper asked if there

were any drugs on the premises and Cruz said no. Harper then said "then you wouldn't mind if we searched the home?" The defendant replied "no not at all." The conversation was in English. Although defendant is a Latino, he speaks and understands English and fully understood what the officer said and wanted. No threats were expressed or implied, and no force was employed. Harper told Cruz he would need to have other officers assist him and Blair and asked the other two officers, Metcalf and Snyder, who were outside to come in. Defendant was not, at this time, handcuffed or restrained. When officer Metcalf came into the premises, he asked defendant if it was "right" that it was okay to search the premises and defendant said "go ahead." The officers searched the premises.

5. While the premises were being searched defendant was in the living room. He was not free to go. If he had tried to leave he would have been arrested. He was eventually handcuffed after guns and drugs were found. He was in custody at the time of his interview. The search of the premises turned up cocaine and guns within a few minutes. Defendant never asked the officers to stop their search. Officer Harper made small talk with defendant and then attempted a tape recorded interview. After some preliminary questions the officer asked defendant if he was aware of his Miranda rights, "You heard um read ... maybe on T.V. When someone says you have the right to remain silent?" "You have the right to an attorney. If you cant' afford an attorney, we will appoint an attorney for you." Defendant was never specifically told *he* had a right to silence, but asked if he had heard the advice on television. No advice was actually given that defendant had a right to counsel *present* at any interrogation or specifically that an attorney would be appointed for the defendant. The time of the availability of counsel was never mentioned and the reference was as to what defendant may have heard on television. No advice of any kind was given that what defendant said could or would be used against him. No express or implied waiver of any *Miranda* right was obtained.

3. *Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct.

*Discussion*

*Miranda*

The defendant has moved to suppress the oral statement he gave to Officer Harper because there was insufficient compliance with the warning requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* requires that a suspect who is in police custody 384 U.S. p. 444 and n. 4, 86 S.Ct. p. 1612 and n. 4, be given a warning of his right to remain silent and say nothing, that if the suspect makes a statement, what is said can and will be used against him. *Miranda,* pp. 465–469, 86 S.Ct. pp. 1623–1625; *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Cordoba v. Hanrahan,* 910 F.2d 691 (10th Cir.1990). Further, the suspect must be told that he has a right to have counsel present during questioning and that counsel will be made available for him if he cannot afford it. *Miranda,* 384 U.S. pp. 467–473, 86 S.Ct. pp. 1624–1627. The warnings are prerequisites to the admission of any statement. "Assessments of the knowledge the defendant possessed ... can never be more than speculation." Id., p. 469, 86 S.Ct. p. 1625. Therefore, any reference to what someone may have heard on television is insufficient to meet *Miranda* standards. The advice must be specific to the suspect and must be "clear and unequivocal." Id., pp. 467–468, 86 S.Ct. pp. 1624–1625. Although no special litany is required, full compliance with all the elements of the *Miranda* warning is required. *Duckworth v. Eagan,* 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989); *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981); *United States v. Soria–Garcia,* 947 F.2d 900 (10th Cir.1991). A waiver of Miranda rights cannot be implied from silence.[3] There must be a waiver of the *Miranda* rights shown from totality of the circumstances. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Tague v. Louisiana,* supra. It need not take any particular form, Id.; *Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct.

652, 62 L.Ed.2d 622 (1980).

828, 93 L.Ed.2d 920 (1987) but the waiver must clearly be shown.

■ A defendant is not necessarily in custody simply because he is a suspect. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *United States v. Ellison*, 791 F.2d 821 (10th Cir.1986). A suspect is usually not in custody in his home when officers merely want to speak to him. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). See also *United States v. Higgins*, 2 F.3d 1094 (10th Cir.1993); *United States v. Mitchell*, 966 F.2d 92 (2nd Cir.1992); *United States v. Warner*, 971 F.2d 1189 (6th Cir.1992). However, when a suspect is under arrest in his home or subjected to the functional equivalent of arrest, "custody" for *Miranda* purposes has occurred. See *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Pennsylvania v. Bruder*, 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988). The determination is an objective one. *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). In *Orozco* where the defendant was interrogated in the bedroom of his home, but under circumstances equivalent to arrest. The Supreme Court held a *Miranda* warning was required.

■ In this case the questioning was not simply in defendant's home. He was not free to leave. He was restricted in his movements. If he had attempted to leave he would have been arrested. At one point he was handcuffed. The facts parallel those of *Orozco*. The defendant was in custody for purposes of *Miranda*. *United States v. Griffin*, 922 F.2d 1343, 1346 (8th Cir.1990). The interrogating officer believed defendant to be in custody. Consequently, defendant was entitled to a proper *Miranda* warning.

■ The warning was deficient. It did not directly advise defendant of his rights but referred to what he may have observed on television. Nothing was said directly to defendant that he had a right to his silence. Nothing was said at all about the right to have counsel present during questioning. In addition, defendant was not told that what he said could be used against him. This was a significant deficiency. *United States v. Tillman*, 963 F.2d 137, 141 (6th Cir.1992) (failure to advise defendant of the effect of statement requires suppression). Finally, there was no effective waiver of the suspect's *Miranda* rights.

Consequently, the defendant's motion to suppress his statement as having been taken in violation of *Miranda* should be granted.

### Search of Premises

■ The government contends the search in this case was based on consent and that the evidence of consent is convincing. *United States v. Werking*, 915 F.2d 1404, 1410 (10th Cir.1990). The defendant contends that the search was not based on consent. The court has rejected defendant's version of the event finding he gave false testimony at the suppression hearing on material issues. The defendant puts some stress on a claim that ruse was first attempted to get defendant to come to the door by the statement that the officers were neighbors.[4] However, no ruse was used to gain entrance. The officers had fully identified themselves as police officers and defendant voluntarily let them into the premises. There was no threat of force or intimidation used by the officers. The officers asked defendant if they could enter and talk. Defendant voluntarily let the officers inside. The officers could have entered without permission pursuant to the warrant. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). They could have arrested defendant and asked defendant's permission to search while he was lawfully arrested. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (fact of lawful arrest does not preclude consent);

---

4. The use of ruse to gain entrance is not necessarily improper. *Dalia v. United States*, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979); *Sabbath v. United States*, 391 U.S. 585, 590 n. 7, 88 S.Ct. 1755, 1758 n. 7, 20 L.Ed.2d 828 (1968); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). The use of a ruse is dependent on the circumstances. *United States v. Leung*, 929 F.2d 1204 (7th Cir.1991); *United States v. Defeis*, 530 F.2d 14, 15 (5th Cir.1976). Here the true intent was disclosed before entry. See *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir.1990).

*United States v. Zapata,* 997 F.2d 751 (10th Cir.1993). However, the officers pursued a softer approach. The tactic of a "knock and talk" was utilized instead. This approach has been recognized as a manner of consent search. *State v. Betcher,* 1992 WL 231657, at *1 (Minn.App.1992) (no constitutional problem in the abstract with knock and talk consent search. Consent search upheld); *State v. Green,* 598 So.2d 624 (La.App. 3 Cir., 1992) (knock and talk search not unlawful); *State v. Land,* 106 Or.App. 131, 806 P.2d 1156 (1991) (knock and talk search upheld based on consent).

The entry in this case was not involuntary because at one point officer Harper unfastened his weapon and lifted it a short distance in the holster. There is no evidence defendant saw it. The defendant's statement that he was outside and the officer pulled a gun and pointed it at him is false. Defendant suggests that Harper was not telling the truth because no telephone or radio, which defendant allegedly had, was found. The officer did not testify that no phone was found. The officer when asked "whats happened to the phone?" replied "I don't recall" (Tr. p. 46). This is not a statement that a phone was not found. Although some differences exist in the officers' testimony, these are minor and do not effect the general consistency of the various officers' testimony (See Exh. A, Officer Harper's report). In contrast, defendant perjured himself, including feigning the lack of an English language facility. The consent to entry was lawful. See *United States v. Dickerson,* 975 F.2d 1245 (7th Cir.1992).

The precise issue is whether under the totality of the circumstances a valid consent to search was given by defendant *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Recently in *United States v. Butler,* 966 F.2d 559 (10th Cir.1992) the court stated the proper standard:

To admit evidence obtained from a search, wherein consent was given, the following must be found:

(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and

(2) The government must prove consent was given without duress or coercion, express or implied.

966 F.2d p. 562.

The facts of this case meet the *Butler* standard for a consent search. There was less ambiguity and confusion in this case than in *United States v. Maynes–Ortega,* 857 F.2d 686 (10th Cir.1988) where the search was upheld and found to be validly based on consent.

See also *United States v. Wilkinson,* 926 F.2d 22 (1 Cir.1991); *United States v. Benitez,* 899 F.2d 995, 998–99 (10th Cir.1990); *United States v. Medlin,* 842 F.2d 1194 (10th Cir.1988).

█ In this case defendant was in his own home. At the time consent was requested no guns were displayed. No threats were made. The officers had identified themselves. Only two officers were present when consent was given. It is natural that other persons on the premises of a drug trafficker's home would leave when the police arrived. The persons were not told to leave but left on their own. Although defendant was nervous, the circumstances do not show any confusion or lack of understanding by the defendant of the officer's request. The defendant's initial response was not mere acquiescence in the request but rather was an affirmative authorization made immediately on request. There was no hesitation. Before the search commenced, Officer Metcalf again asked defendant if the search of the house was authorized. Again defendant answered affirmatively. The scope of the search was made known to the defendant to include the full premises. There was no misunderstanding by defendant. The search was within the scope of the authorization. *Florida v. Jimeno,* 500 U.S. 248, ——–——, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991); *United States v. Gay,* 774 F.2d 368, 377 (10th Cir.1985). The defendant at no time asked that the search cease, even after drugs and guns were first found.

█ There is no presumption against consent, *United States v. Price,* 925 F.2d 1268 (10th Cir.1991); *United States v. Recalde,* 761 F.2d 1448 (10th Cir.1985), although bur-

544

den of proof is on the prosecution to show consent. The government has carried its burden by convincing evidence. In this case, the defendant's consent was voluntary. *United States v. Bell,* 892 F.2d 959 (10th Cir.1989); *United States v. Medlin,* 842 F.2d 1194 (10th Cir.1988) (residence search voluntary where defendant employed words affirmatively authorizing seizure); *United States v. Zapata,* supra. The search in this case was voluntarily. *Schneckloth,* supra.

### Conclusion

The defendant Manuel Cruz' motion to suppress the statements he gave to police should be granted based on a violation of *Miranda v. Arizona,* supra. The defendant's motion to suppress evidence taken from his premises should be denied. No Fourth Amendment violation occurred. The search and seizure was lawful.

Copies of the foregoing report and recommendation are being mailed to the parties. They are hereby notified of their right to file objections hereto within 10 days from the receipt hereof.

DATED this 21st day of September, 1993.