[No. A116899. First Dist., Div. One. Dec. 29, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
SYLVESTER ANTOINE BRADFORD, Defendant and Appellant.

844

## COUNSEL

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARGULIES, J.**—Defendant was convicted of second degree murder and other offenses. Following his arrest, he was interviewed by the police. Prior to beginning the interview, the officers quizzed defendant about his knowledge of the *Miranda*[1] warnings from prior arrests and watching television. Although the officers eventually mentioned three of the four required warnings during the discussion, they omitted any reference to the use of defendant's statements against him. After an extended subsequent interrogation, defendant confessed to the shooting.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

The trial court found the *Miranda* warnings adequate and admitted defendant's statement in the prosecution's case-in-chief. We conclude that defendant's statement should have been suppressed and that its admission was not harmless error. Accordingly, we reverse.

## I. BACKGROUND

Defendant was charged in an information, filed December 29, 2004, with murder (Pen. Code, § 187), being a felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)), and being a felon in possession of ammunition (Pen. Code, § 12316, subd. (b)(1)). The information also alleged that defendant personally used a firearm (Pen. Code, § 12022.53) and had suffered three prior prison convictions (Pen. Code, § 667.5, subd. (b)).

The testimony at trial demonstrated that defendant shot the victim, Dale Jones, during an argument, killing him. The only witness who acknowledged being in the room at the time of the shooting was Mia, the 11-year-old daughter of a woman who lived in Jones's home. According to Mia's testimony, she, her mother, and Jones were talking in Jones's bedroom about 1:00 a.m., when defendant came to the door of the home. Mia had seen defendant at the house before. Jones left the bedroom to talk to defendant. When Jones returned to the bedroom, Mia was ready for bed. She asked Jones to ask defendant to leave the house. Jones left to make the request and then returned to the bedroom, followed a minute later by defendant. As an argument began, Jones stood up from the bed, and the two men stood close to each other, arguing angrily. Mia, who told the police she thought defendant perceived Jones's standing to be "a threat, that he was going to fight or something," agreed at trial that defendant "could have" taken Jones's conduct in that way. Defendant then stepped back and pulled a gun from his jacket. While Mia acknowledged telling the police that defendant had " 'pulled out the gun to defend,' " she testified at trial that he then laid the gun on the corner of the bed, saying to Jones, " [']Just shoot me,['] or [']kill me,['] or something like that," before picking it up again. As the argument continued, Mia covered her head with a pillow. She heard a shot, Jones speaking indistinctly, two more shots, and footsteps leaving. By the time Mia ran from the room, defendant had left the house.

Mia's mother gave testimony consistent, in its broad outlines, with her daughter's. The mother, however, claimed that the shooter was not defendant but another man who "look[s] almost identical" to defendant. That testimony was inconsistent with her statement to police shortly after the shooting, when she identified defendant as the shooter. The mother also testified that she had left the bedroom by the time the shooting began. After the first shot, she

testified, the shooter emerged from the bedroom and headed to the door of the house, but he turned back, returned to the bedroom, and fired the second and third shots.

Defendant was arrested by police later in the day of the shooting and interrogated. At the beginning of the interrogation, a detective delivered an incomplete version of the *Miranda* warnings:

"Detective: Well, you've been arrested before. You know how this game works, right?

"[Defendant]: Never like this before, though. [¶] . . . [¶]

"Detective: Okay. When you got arrested in the past, what happened?

"[Defendant]: Took me straight up to booking.

"Detective: Nobody ever talked to you?

"[Defendant]: I ain't never been talked to by detectives.

"Detective: Well, you probably need to now. I want to talk to you about the case that you're here for. Before I do—you watch television, right?

"[Defendant]: Excuse me?

"Detective: You watch television?

"[Defendant]: Yes, sir.

"Detective: You watch cop shows?

"[Defendant]: Yes, sir. Yes, sir.

"Detective: What happens when people get arrested on cop shows?

"[Defendant]: It seem like this a halfway trick question. They interview them.

"Detective: Well, sure, but I mean what happens before they get interviewed?

"[Defendant]: They get arrested.

"Detective: They get arrested. And they go, you got the right, right?

"[Defendant]: To remain silent. They gives you your rights.

"Detective: Right.

"[Defendant]: Okay.

"Detective: Have you ever had that done to you before?

"[Defendant]: My rights read to me?

"Detective: Yes.

"[Defendant]: Of course.

"Detective: Of course. And do you understand those rights?

"[Defendant]: You reading them to me?

"Detective: No, I mean when they've been read in the past—

"[Defendant]: Oh.

"Detective: —did you understand them?

"[Defendant]: Yes. Yes, I do.

"Detective: Didn't have any problem understanding what that meant when they said you have the right to remain silent?

"[Defendant]: No.

"Detective: Didn't have any problem understanding what that meant when they said you have the right to an attorney?

"[Defendant]: All that, I know.

"Detective: And didn't have a problem understanding what they meant when they said you have the right to have an attorney present with you before and during any questioning?

"[Defendant]: Uh-huh.

"Detective: But if you so desired but could not afford one, an attorney would be appointed to represent you at no charge?

"[Defendant]: Uh-huh.

"Detective: You always understood that?

"[Defendant]: Yeah.

"Detective: Okay. Did you ever have any questions about that?

"[Defendant]: No.

"Detective: When you watched television or when it was read to you in the past?

"[Defendant]: Huh-uh."

The colloquy continued briefly in this vein, but the interrogating detective never mentioned the fourth *Miranda* warning, that anything said by defendant during the interrogation could and would be used against him in court.

The subsequent interrogation lasted for four and one-half hours. Although defendant initially denied knowledge of Jones's killing, he eventually confessed. Describing the shooting, defendant said that when he entered the bedroom, Jones was lying on the bed. An argument began. When Jones "jumped up" from the bed, defendant picked up a gun that was "lying" on the dresser and shot Jones once. As Jones walked from the bedroom into the adjacent bathroom, defendant followed him and shot him again. Defendant then put the gun back on the dresser and left. According to defendant, he fired the first shot because "I don't want him to try to grab me or do nothing to me," but defendant did not explain the second shot.

Thereafter, the detectives gave defendant a telephone to permit him to call his girlfriend. During the conversation, he told her, "I just made up a little story, you know, we got to arguing and everything, it was his gun and this and like it was, you know, and I just grabbed it and I used it and I was scared."

The trial court denied a motion to suppress evidence of the interrogation, made on grounds that the detectives did not comply with *Miranda* and that the confession was involuntary. At trial, a detective was permitted to testify about defendant's statements during the interrogation, and excerpts of a videotape of the interrogation, including the call with the girlfriend, were

shown to the jury. The detective also testified that he had listened to telephone calls made by defendant from prison. In none did defendant characterize himself as shooting in fear or self-defense.

The defense presented witnesses who testified that Jones, a drug user and dealer, had engaged in various types of violent and threatening conduct in the past, particularly when he was under the influence of drugs. Testifying on his own behalf, defendant said that on the night of the shooting he went to Jones's house to buy drugs. He took a gun along for protection. He and Jones used drugs in the kitchen. After Jones went into the bedroom, he called defendant in, asking where the remainder of the drugs were. When defendant told Jones he had used all the drugs, Jones became angry. After yelling at defendant while lying on the bed, Jones sat up, reached as though he was retrieving a gun, and jumped up from the bed. Defendant shot him, fearing for his life. Because Jones continued to approach after the first shot, defendant shot him again.

The jury convicted defendant of second degree murder and the two possession offenses and found the personal gun use enhancement allegation to be true. The trial judge found two of the prior prison term allegations to be true. Defendant was sentenced to a term of 15 years to life on the second degree murder charge, increased to 25 years to life as a result of the gun use enhancement. The sentences associated with the remaining counts and enhancements were stayed.

## II. DISCUSSION

### A. *Admission of Defendant's Confession*

#### 1. *Compliance with* Miranda

Defendant first contends that his confession should have been suppressed because the *Miranda* warning he was given by the detectives failed to advise him that anything he said could be used against him in court. Reviewing de novo the trial court's denial of the motion to suppress (*People v. Waidla* (2000) 22 Cal.4th 690, 730 [94 Cal.Rptr.2d 396, 996 P.2d 46]), we agree that defendant's statements should not have been admitted in the prosecution's case-in-chief.

The Attorney General concedes that the detectives did not advise defendant that his statements could be used against him in court, but argues that the confession was properly admitted because defendant's comments during the interrogation—for example, a reference to incriminating himself—showed

that he was aware that his statements could be used later, despite the failure of the detectives to so advise him.

The argument is resolved against the Attorney General by *Miranda* itself, which repeatedly characterizes informing a suspect of each of the four warnings as an *"absolute* prerequisite" to the admission in court of the suspect's statements to police. (*Miranda, supra,* 384 U.S. 436, 468, 471, 476, italics added.) *Miranda* first applied the label "absolute prerequisite" to the requirement that a person in custody who is subjected to interrogation be informed he or she has the right to remain silent. The court explained that, because "[t]he Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact." (*Miranda,* at pp. 468–469, fn. omitted.)

The court proceeded to declare that this warning must be accompanied by the explanation that anything said during the interrogation can and will be used against the suspect in court. As the court noted, "[t]his warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." (*Miranda, supra,* 384 U.S. at p. 469.)

After discussing the additional advisements regarding the assistance and appointment of counsel, the court cautioned again, "As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. *No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead.* Only through such a warning is there ascertainable assurance that the accused was aware of this right." (*Miranda, supra,* 384 U.S. at pp. 471–472, italics added.)

Twice more in the decision, the court stated that a defendant's statements to police are inadmissible in the absence of each of the four warnings, first noting, "The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a

defendant." (*Miranda, supra,* 384 U.S. at p. 476.) Again in summing up, the court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning," he or she must be given each of the four warnings. (*Id.* at p. 478.) "[T]he individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (*Id.* at p. 479, fn. omitted.) The only possible conclusion to be drawn from *Miranda,* repeated several times in the decision, is that a defendant's statement is inadmissible unless all four warnings were given to the defendant prior to the interrogation, regardless of the defendant's understanding of his or her rights.

At least two published federal decisions have interpreted *Miranda* as establishing such an absolute rule. In *U.S. v. Tillman* (6th Cir. 1992) 963 F.2d 137, the defendant was provided three of the four *Miranda* warnings but was not told that his statements could be used against him. (*U.S. v. Tillman,* at p. 140.) Characterizing this as a "dangerous omission" because of the importance of the warning in explaining the significance of the right to silence, the court held the confession inadmissible: "Although there is no mandate that 'magic words' be used, there is a requirement that all elements of Miranda be conveyed. This was not done here. The officers failed to convey the substance of defendant's rights under law." (*Id.* at p. 141, italics added.) An identical conclusion was reached in *U.S. v. Cruz* (D. Utah 1993) 838 F.Supp. 535, which presented virtually the identical situation we face here. The interrogating officers asked the defendant if he was familiar with his *Miranda* rights from watching television and proceeded to describe the rights to silence and the assistance and appointment of counsel, but they failed to mention the use of statements in court. (*U.S. v. Cruz,* at p. 538.) As a result of this omission, the court held the interrogation evidence inadmissible. (*Id.* at p. 542.)

Although courts have permitted officers some latitude in the manner in which the *Miranda* warnings are delivered, we are unaware of any post-*Miranda* decision that has permitted the admission of a defendant's statements in the absence of a showing that a recognizable version of each of the four warnings was provided to the suspect. In *Duckworth v. Eagan* (1989) 492 U.S. 195 [106 L.Ed.2d 166, 109 S.Ct. 2875], for example, the court characterized *Miranda* as " 'presum[ing] that interrogation in certain custodial circumstances is inherently coercive and . . . that statements made under those circumstances are inadmissible unless the suspect is specifically warned of his *Miranda* rights and freely decides to forgo those rights.' " (*Duckworth v. Eagan,* at p. 202, quoting *New York v. Quarles* (1984) 467 U.S. 649, 654

[81 L.Ed.2d 550, 104 S.Ct. 2626].) All four warnings were given in *Duckworth*, but one was arguably imperfect; the officers told the defendant that an attorney would be appointed for him, if he could not afford one, " 'when you go to court,' " rather than before any interrogation. (*Duckworth*, at p. 198, italics omitted.) Despite this phrasing, the court concluded that the warning, taken as a whole, adequately conveyed the right to counsel during an interrogation. (*Id.* at pp. 203–204.) In finding the confession admissible, however, it expressly noted that the warning "touched all of the bases required by *Miranda*." (*Id.* at p. 203.)

Like *Duckworth*, the two cases on which the Attorney General largely relies featured defendants who were provided all four warnings, although one of them was incomplete in some manner. In *People v. Samayoa* (1997) 15 Cal.4th 795 [64 Cal.Rptr.2d 400, 938 P.2d 2], the defendant was advised his statements could be used against him, but this warning might have omitted the words "in court." (*Id.* at p. 828.) Reasoning that the language reasonably conveyed to the defendant his *Miranda* rights, the court affirmed admission of the interrogation evidence. (*Samayoa*, at p. 830.) In *People v. Nitschmann* (1995) 35 Cal.App.4th 677 [41 Cal.Rptr.2d 325], the officers told the defendant he had a right to consult an attorney with respect to his interrogation, but they did not expressly say that the attorney could be consulted "before and during" the interrogation. (*Id.* at pp. 681, 682.) The court affirmed admission of the confession because the officers' colloquy with the defendant demonstrated that he recognized his right to have counsel present "then and there." (*Id.* at p. 682.)

In some of these cases, the courts examined the record to determine that the defendant understood the *Miranda* advisements, but they turned to the record only after finding that some form of each warning was given to the defendant. The evidence of understanding was therefore used not as a substitute for one of the four warnings, but rather to demonstrate that the defendant properly understood an arguably imperfect warning. In this way, *Miranda* differs from the law governing the advisements that must be given to a defendant at the time of plea allocution. Under *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449] (*Tahl*), our Supreme Court, following *Boykin v. Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709] (*Boykin*), held that when a voluntary guilty plea is entered, the defendant must expressly be informed of and waive three specific constitutional rights. Originally, a trial court's failure to give the required advisements and obtain a waiver was held to require automatic reversal of the conviction. (See generally *People v. Allen* (1999) 21 Cal.4th 424, 437 [87 Cal.Rptr.2d 682, 981 P.2d 525].) Many years after *Tahl*, however, in *People v. Howard* (1992) 1 Cal.4th 1132 [5 Cal.Rptr.2d 268, 824 P.2d 1315], the court relaxed this ruling, holding that when a defendant is not given the *Boykin-Tahl* advisements, reversal is required only if the record does not demonstrate that the plea was

knowingly and intelligently entered. (*People v. Allen*, at p. 438.) "In replacing the old rule, the focus was shifted from whether the defendant received express rights advisements, and expressly waived them, to whether the defendant's admission was intelligent and voluntary because it was given with an understanding of the rights waived. . . . Now, if the transcript does not reveal complete advisements and waivers, the reviewing court must examine the record of 'the entire proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the totality of circumstances." (*People v. Mosby* (2004) 33 Cal.4th 353, 361 [15 Cal.Rptr.3d 262, 92 P.3d 841].)

There has been no similar relaxation of the *Miranda* requirements. Here, it was not even hinted to defendant that his statements might later be used against him; the issue was not mentioned at all. Because the detectives failed to give defendant one of the four required *Miranda* warnings, his confession was inadmissible in the prosecution's case-in-chief.[2]

### 2. *Prejudice*

We must reverse a conviction that rests on evidence from an interrogation conducted in violation of *Miranda* unless admission of the evidence was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 21–22 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1403 [112 Cal.Rptr.2d 769] (*Lujan*).) We cannot make that finding here.

Although it is beyond doubt that defendant was the killer, the evidence of his mental state at the time of the shooting is less clear cut. When asked by investigating officers whether Jones threatened defendant, Mia said, "Well, in a way. Because he stood up. And he was getting pretty angry. [¶] . . . [¶] . . . [W]hen [Jones] stood up, I really think that [defendant] took that as a threat that he was going to fight or something. So he pulled out the gun to defend."[3] Based on this testimony, the jury could have concluded that defendant shot Jones in "imperfect" self-defense, actually but unreasonably believing himself in imminent danger. This conclusion would have supported a conviction only of voluntary manslaughter. (*In re Christian S.* (1994) 7 Cal.4th 768, 771, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574].) Alternatively, the evidence of a quarrel could have resulted in a finding that defendant acted in the "heat of passion," which also would have reduced his offense to voluntary manslaughter. (E.g., *People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [82 Cal.Rptr.3d 265, 190 P.3d

---

[2] Because we find the confession to have been obtained in violation of *Miranda*, we need not reach defendant's contention that his confession should have been suppressed because he invoked his right to silence in the course of the interrogation.

[3] A transcript of Mia's statement to police was introduced into evidence at trial.

616].) At a minimum, in the absence of any other evidence, Mia's testimony could have raised a reasonable doubt whether defendant possessed the mental state necessary to support a murder conviction. Supporting this conclusion was the evidence that Jones was a physically large man who had engaged in past acts of violence, particularly when he was under the influence of drugs, as he apparently was at the time of the killing.

■ Defendant's confession was used by the prosecution for the specific purpose of removing doubts about defendant's mental state. A confession is uniquely powerful evidence. (E.g., *In re Cox* (2003) 30 Cal.4th 974, 1032 [135 Cal.Rptr.2d 315, 70 P.3d 313] ["as the United States Supreme Court has recognized, evidence of a confession has . . . a 'profound impact on the jury' "].) Testifying about defendant's confession, the detective characterized it as containing no reference to fear or self-defense.[4] The prosecutor amplified this characterization in closing argument, quoting defendant as having said, when asked by the detectives whether there were mitigating circumstances, " 'Nah, it wasn't nothing lawful. I can't think of anything lawful to explain it.' " Despite this use of the confession, the jury deliberations lasted five days, and jurors sent notes to the court suggesting that they were having difficulty agreeing on defendant's mental state. Because of the significant bearing of the confession on the crucial issue of defendant's mental state and the ample evidence that would have supported a finding of voluntary manslaughter rather than murder, we cannot say admission of the confession was harmless beyond a reasonable doubt.

In arguing to the contrary, the Attorney General first contends that the confession would have been admitted in any event to impeach defendant's testimony. (See *People v. DePriest* (2007) 42 Cal.4th 1, 32 [63 Cal.Rptr.3d 896, 163 P.3d 896] [voluntary confession obtained in violation of *Miranda* admissible for purposes of impeachment].) Defendant responds that admission of the confession for impeachment purposes should not be considered in a prejudice analysis because he would not have testified if his confession had not been admitted improperly. We agree that admission of the confession for purposes of impeachment should not be considered, although for a somewhat different reason. Whether defendant would have testified in the absence of the need to respond to his confession and, if so, whether the confession would have been admitted for purposes of impeachment requires us to engage in speculation about the parties' tactical choices. Because it is impossible to determine what might have happened had the trial proceeded differently, we conclude that prejudice should be evaluated on the basis of the evidence actually presented, while excluding the improperly admitted confession. On

---

[4] The characterization was not wholly accurate. As noted above, defendant told the detectives that he shot when Jones stood up from the bed because, "I don't want him to try to grab me or do nothing to me."

this basis, as noted above, we cannot find the confession's admission to have been harmless beyond a reasonable doubt.

In arguing for consideration of the confession as impeachment, the Attorney General relies on *Lujan, supra,* 92 Cal.App.4th at page 1409, in which a conviction was affirmed despite the wrongful admission of the defendant's confession. *Lujan* did not, however, consider the contents of the inadmissible confession in determining prejudice. Rather, the court considered the defendant's own testimony at the trial, the contents of which happened to be "virtually the same as those of his confession." (*Id.* at p. 1403.) Although the court acknowledged the defendant's argument that he had testified only because his confession had been admitted, the court refused to disregard his testimony on this ground. (*Ibid.*) In contrast, the Attorney General is asking us to consider, not defendant's testimony, but the *inadmissible confession itself.* The Attorney General articulates no basis for extending the reasoning of *Lujan* that evidence properly admitted in the trial should be considered in a prejudice analysis, regardless of the motive for the testimony, to cover improperly admitted evidence as well. Further, if we consider defendant's testimony, as was done in *Lujan*, it reinforces the argument for prejudice. Unlike the testimony of the defendant in *Lujan*, defendant's testimony was not the same as his confession and was, in particular, more favorable on the critical issue of his mental state.

In arguing further that the evidence overwhelmingly refutes any claim of self-defense, the Attorney General relies primarily on the account of the shooting by Mia's mother. The mother's testimony, however, contained a number of improbabilities, including, among many others, her impeached claim that the shooter was not defendant but a man who looked virtually identical to him, and the assertion that Mia was the product of a virgin birth. These deficiencies call its overall credibility into serious question. In any event, because Mia's mother claimed not to have been in the bedroom at the time the shooting occurred, she could not have witnessed the critical events immediately prior to the shooting.

The Attorney General also draws our attention to the forensic analysis of Jones's wounds. While this evidence is certainly suggestive, we do not find it sufficiently compelling to rule out all reasonable doubt on defendant's mental state. An expert witness for the prosecution testified that the first two shots to hit Jones were fired from about four feet away. Both passed largely through soft tissue, and neither would have been lethal. The fatal shot was fired last, from a closer distance and from the opposite direction from the first two. As the Attorney General argues, it was unlikely that countering any threat defendant felt would have required all three shots. As the expert acknowledged, however, the first two shots did not necessarily interfere with Jones's ability

to walk and talk, which leaves open the possibility that defendant believed Jones continued to present a threat even after he fired these shots.

The Attorney General also cites defendant's conversation with his girl-friend, which was recorded during a break in the interrogation. Even assuming this conversation remained properly admissible, defendant's comments were not so unambiguous as to rule out the possibility of self-defense.

## B. *Defendant's Other Contentions*

Defendant raises several other contentions. For the reasons discussed below, we decline to rule on them.

In addition to seeking suppression of evidence of his confession on the basis of inadequate *Miranda* warnings, defendant argued in the trial court that his confession was involuntary because he repeatedly invoked his right to silence and was promised leniency and coerced. The trial court denied the motion, concluding that "the claim that his statements were not free, voluntary and knowingly made is not true. The Court expressly finds that the statements here in all respects were freely and voluntarily made." Defendant repeats these grounds for finding his confession involuntary, but he adds to them the claim that he was under duress as a result of forced hunger and pain from handcuffs throughout the interrogation.

While we realize this claim might well arise on remand if defendant elects to testify (*People v. DePriest, supra,* 42 Cal.4th at p. 32), we decline to rule on it. If the issue is raised on remand, defendant will be entitled to a new determination. (*People v. Mattson* (1990) 50 Cal.3d 826, 849–850 [268 Cal.Rptr. 802, 789 P.2d 983], superseded by statute on another ground as stated in *People v. Bolin* (1998) 18 Cal.4th 297, 315, fn. 2 [75 Cal.Rptr.2d 412, 956 P.2d 374].) When the motion was made below, defendant did not raise the issue of his hunger or the fact that, despite his repeated complaints of pain, his hands were cuffed behind his back for much of the interrogation.[5] The impact of these conditions on the voluntariness of defendant's confession is fundamentally an issue of fact. To consider these matters for the first time on appeal would be improvident when, as it appears, further hearing in the trial court could provide a more informed basis for decision. Even if, as the Attorney General urges, we deem the hunger and handcuff issues waived for purposes of this appeal, these issues could be raised on remand. Our ruling would therefore provide little or no guidance to the trial court in redetermining the motion. (E.g., *People v. Mattson,* at p. 853 [appellate ruling is not law of the case if "new or different" facts are asserted on retrial].)

---

[5] Because we have not been provided a videotape of the interrogation, we cannot confirm the fact of the handcuffs or the duration of their presence.

For similar reasons, we decline to rule on defendant's claim that the trial court should have redacted from the confession videotape a detective's comment that other persons had portrayed defendant as a "cold-blooded murderer."

Finally, we need not address defendant's claim that the trial court erred in its handling of jury questions. Because these particular questions are unlikely to recur on remand, the trial court's conduct is moot in light of our reversal.

## III.   DISPOSITION

The judgment of the trial court is reversed. The matter is remanded to the trial court for further proceedings consistent with this decision.

Marchiano, P. J., and Swager, J., concurred.