UNITED STATES of America, Plaintiff,

v.

Nic T. LOGAN, Wendy J. Darnall and Bennie U. Reed, Defendants.

Nos. 02–40051–01–SAC, 02–40051–02–SAC, 02–40051–03–SAC.

United States District Court, D. Kansas.

Oct. 16, 2002.

---

**1168**

Marilyn M. Trubey, David J. Phillips, Office of Federal Public Defender, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case comes before the court on the defendant Bennie U. Reed's following pretrial motions: Motion for Bill of Particulars (Dk.51) and Motion to Suppress Evidence (Dk.53); and on the defendant Wendy Darnall's Motion to Suppress Evidence (Dk.57); and on the defendant Nic T. Logan's following pretrial motions: Motion to Suppress Statement (Dk.59); Motion to Suppress Evidence (Dk.60); Motion to Compel Discovery Regarding Informant (Dk.62); and Motion for Bill of Particulars (Dk.64). The government has filed a consolidated response addressing all of the defendant's motions. (Dk.69). On July 11, 2002, the court heard evidence on the motions to suppress as well as counsels' arguments on all motions. Having reviewed all matters submitted and researched the law relevant to these issues, the court is ready to rule.

## INDICTMENT

On April 23, 2002, the grand jury returned a three-count sealed indictment against the defendants Nic Logan, Wendy Darnall and Bennie Reed. Count one charges Logan and Darnall with a conspiracy beginning sometime before January 11, 2002, and continuing through January 11, 2002, to manufacture more than 500 grams of methamphetamine in violation of 21 U.S.C. § 846 with reference to 21 U.S.C. §§ 841(a) and 841(b)(1)(A). Count two charges Logan and Darnall with attempted manufacture of more than 500 grams of methamphetamine on or about January 11, 2002, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A). Count three charges Logan and Reed with a conspiracy beginning sometime after December 14, 2001, and continuing through January 14, 2002, to possess the listed chemical of ephedrine and pseudoephedrine knowing or having reasonable cause to believe this chemical would be used to manufacture methamphetamine in violation of 21 U.S.C. § 841(c)(2).

## FACTS

On January 10, 2002, Kansas Bureau of Investigation ("KBI") Special Agent Jeff Brandau spoke with Detective Jerry Green of the Jefferson County Sheriff's Office concerning information he had received from a confidential informant about Nic Logan's involvement in the manufacture of methamphetamine and Logan's anticipated purchase of a large number of pseudoephedrine tablets. Around 4:40 a.m. on January 11, 2002, Detective Green telephoned Agent Brandau and said that during the early morning hours unknown assailants had attacked and beaten Nic Logan in his residence and that Logan was being medically treated at Stormont–Vail Hospital in Topeka. Agent Brandau

arrived at the Logan residence sometime after 5:00 a.m. and met with Detective Green and Hal Logan, Nic's father and owner of the home where both Nic and he lived. Hal Logan had no knowledge of the aggravated battery or robbery and wanted to know the condition of his son. Detective Green explained that the incident had allegedly occurred in the basement. Hal Logan told the officers they were free to look and check about the residence and did not limit the areas where they could search. Hal Logan did not say or indicate anything that would suggest he lacked authority to consent to a search of any part of the house and basement.

Hal Logan remained upstairs while Detective Green led Agent Brandau downstairs where they saw a significant amount of blood splattered on the floor. The officers followed the trail of blood drops that led to a bedroom. Agent Brandau pushed open the unlocked bedroom door and observed what appeared to be chemicals and items used in the manufacture of methamphetamine. Agent Brandau shut the door and instructed Detective Green to secure the residence while he obtained a search warrant.

Prior to that morning, Agent Brandau had already prepared a portion of the search warrant affidavit based on information he had received from a confidential informant ("CI"). As set out in the affidavit, Agent Brandau had arrested the CI two years ago on felony drug charges, and the CI recently had been arrested on more felony charges and wanted to assist law enforcement. Brandau began working in October of 2001 with the CI who provided reliable information on three subsequent occasions leading to the arrest of individuals and seizure of evidence related to the manufacture of methamphetamine. The CI told Agent Brandau about a Nic Logan who was a significant manufacturer of methamphetamine and lived in rural Jefferson County, Kansas, and the CI disclosed that additional information could be obtained as to when Logan would be manufacturing methamphetamine. Around 5:00 p.m. on January 10, 2002, Agent Brandau receiving a telephone call from the CI who had observed a five-gallon container of anhydrous ammonia several hours earlier at Logan's residence and had learned Logan would be purchasing 1,500 boxes of pseudoephedrine tablets and manufacturing the tablets into methamphetamine later that same day. Agent Brandau added to the search warrant affidavit what he had observed in Logan's bedroom, that is, glassware and liquids commonly used in the manufacture of methamphetamine. The issuing judge signed the search warrant on January 11, 2002 at 9:10 a.m.

Around 4:00 a.m. on January 11, 2002, Captain Randy Carreno of the Jefferson County Sheriff's Department received a telephone call from his sergeant and learned that Nic Logan had been battered and was being medically treated for those injuries. Captain Carreno arrived at Stormont–Vail hospital around 5:51 a.m. and learned that Logan's injuries were not life-threatening. He initially spoke with Logan in the emergency room where he was receiving medical care for injuries to his head, back and shoulder. The Captain found Logan to be coherent and capable of understanding questions and providing intelligible and complete responses.

Hospital personnel gave Captain Carreno a description of the vehicle, a PT Cruiser, which brought Logan to the hospital. Shortly before 7:00 a.m., KBI Special Agent Patti Bottorf telephoned Carreno with instructions to seize the PT Cruiser. Captain Carreno positioned his patrol car so as to prevent the PT Cruiser from leaving, photographed it, and placed evidence tape on it. He arranged for a tow

truck to take the car to the Sheriff's Department's impoundment lot. Senior Special Agent Douglass Jorgensen with the KBI was in the parking lot with Captain Carreno and observed that the front passenger seat of the PT Cruiser was covered with blood. Agent Jorgensen confirmed the decision to seize the car as containing evidence relevant to the battery. The amount of blood was evidence of the extent of injury, and it was not known whether any part of the battery occurred inside the car and whether the assailant's blood might also be found there. There also was suspicion that the cardboard boxes in the backseat may contain pseudoephedrine tablets.

Captain Carreno had been told that Wendy Darnall transported Logan to the hospital. When Ms. Darnall returned to the hospital to check on Logan, Captain Carreno came into contact with Ms. Darnall about 8:20 a.m. Upon learning that Logan was about to be released from the hospital and upon telling Ms. Darnall that their car had been seized, the Captain told Ms. Darnall he was headed back to Jefferson County and asked her if she needed a ride back to her residence. Captain Carreno explained that he first would be required to follow their seized vehicle for a period and then he would take her home. Ms. Darnall accepted the Captain's offer for a ride. While sitting together in the patrol car at the hospital, Captain Carreno asked Ms. Darnall about the circumstances leading to the aggravated battery on Mr. Logan. She told the Captain that two men had broken into the residence and that she had been hit with a baseball bat on her shoulder and her leg as she was fleeing the bathroom. She described the assailants, what they had said, and what they had done to Mr. Logan. Around this same time, Ms. Barbara Katt arrived at the hospital and gave the keys to the PT

Cruiser to Ms. Darnall who then turned the keys over to the Captain.

Captain Carreno followed the towed car as far as a convenience store, Petro and Pantry, where Deputy Clay McCarty took over control and impoundment of the car. Ms. Darnall visited the restroom in the convenience store, and Captain Carreno followed her into the store purchasing some coffee and tissue. They exited the store and climbed into their respective seats in the patrol car. Darnall was sitting in the front passenger seat, and Captain Carreno considered her free to leave at any time and free to refuse his questions. At this point, Captain Carreno told Ms. Darnall that he had information indicating she knew why KBI agents were at her residence and that he would like to ask her some questions so that she could tell him what she might know. Ms. Darnall asked, "Is Nic talking?" Captain Carreno said he was unsure whether Mr. Logan was cooperating.

Ms. Darnall then agreed to speak with the Captain and immediately began telling him what they would find at her place. Carreno stopped Darnall and read her the *Miranda* warning and had her execute a waiver of rights form. Ms. Darnall told the Captain that she could read and write, was not taking medication, but had used methamphetamine shortly before the aggravated battery but did not believe it was still in her system. Captain Carreno testified that Ms. Darnall appeared coherent and able to understand everything that was happening. In the convenience store parking lot, Captain Carreno gave paper and pen to Ms. Darnall who wrote a five-page narrative disclosing her knowledge of items found in the residence which were used to manufacture methamphetamine. She also drew a diagram of the bedroom used by her and Mr. Logan that indicated the location of various items. She signed

this statement about 10:22 a.m., and Captain Carreno then took her to the residence arriving about 10:35 a.m.

Special Agent Jorgensen contacted Nic Logan in the hospital emergency room when the hospital was getting ready to discharge him. Jorgensen advised Logan that his PT Cruiser had been seized, that Jorgensen was investigating the battery and the methamphetamine laboratory found in Logan's residence, and that he could give Logan a ride home. Nic Logan accepted the Agent's offer of a ride. Agent Jorgensen never told Logan that he was under arrest nor placed him under arrest. Hospital staff took Logan to the Agent's truck in a wheel chair, and assisted placing him in the front passenger seat. Agent Jorgensen observed that Logan was definitely in pain. On the drive back to Logan's residence, he complained about his soreness and inability to find a comfortable position in the seat.

After officers began executing the search warrant on the Logan residence, Agent Jorgensen arrived at the residence with Nic Logan. Agent Brandau spoke with Nic in the living room where Hal Logan and Agent Larry Dixon were also present. The agents did not handcuff or restrain Nic Logan, did not tell him that he was under arrest or in their custody, and did not command him to speak with them. Though not in his written report, Agent Brandau said he recalled giving Logan the *Miranda* warning. Agent Brandau testified that Logan appeared to be in considerable pain and was lying down on the couch. Nonetheless, Logan also appeared alert and coherent, was able to describe recent events accurately and sequentially, and was oriented to time and space. Logan described the aggravated battery and robbery, the assailants, and what had been said and taken. Agent Brandau subsequently asked Logan about what they found in his bedroom. After twenty or thirty minutes, Agent Brandau terminated the interview because Logan appeared to be in considerable pain. Agent Brandau later returned and sought Logan's written consent to search the PT cruiser. Logan had already told agents that they would find items in the car. Agent Brandau read the consent form to Logan and then he signed it. Agents left the residence without arresting Nic Logan.

Agent Brandau also interviewed Ms. Darnall outside of the Logan residence. He did not give her a *Miranda* warning before speaking with her. She described the aggravated battery and robbery and discussed the items found in her bedroom. She told Agent Brandau that she used methamphetamine but did not manufacture it. Agents left the residence without arresting Wendy Darnall.

On January 14, 2002, Agent Brandau and three other KBI agents went to 1615 S.W. Buchanan to speak with Bennie Reed. The agents knocked on the door, identified themselves, and said they were investigating the crime at Nic Logan's residence and wanted to speak with Reed about it. In response, Reed simply opened the door and walked inside; Agents Brandau and Smith followed him. Reed never objected or protested to the agents' entry or to their subsequent line of inquiry. After a few questions about information they had received that Reed had set up a deal for Logan to acquire 1,500 boxes of pseudoephedrine, Agent Brandau invited two other agents inside who conducted a protective sweep of the residence. Brandau then asked for Reed's consent to search the residence. Reed said that it was his girlfriend's residence and that she would have to give consent. Reed told Agent Brandau how to contact his girlfriend which Brandau did.

While waiting for Reed's girlfriend to arrive, Agent Brandau interviewed Reed about the pseudoephedrine deal. Reed said he had arranged for a deal, but it never took place. When asked who was the intended supplier, Reed said a friend whom he would not disclose without an attorney. Reed's girlfriend arrived shortly thereafter and gave the agents her consent to search. Brandau invited Reed outside to discuss some additional matters. Reed told Brandau that he was a user of methamphetamine and that he had supplied pseudoephedrine to Logan on two occasions this past month. Reed said that Logan was expected to pay fifty cents on the dollar for the pseudoephedrine in the arranged purchase that was never completed. Brandau ended the interview, Reed returned to the residence, and the agents left without arresting Reed.

## MOTIONS FOR BILL OF PARTICULARS (Dks. 51 and 64).

In his motion, the defendant Reed seeks factual details about the conspiracy charged in count three of the indictment. He wants to know where the alleged conspiracy was commenced, the manner in which it was designed to achieve its purpose, the period of time that it had existed, the persons present when the conspiracy had begun, the persons who later had joined the conspiracy, the contents and terms of the conspiratorial agreement, the overt acts of defendants and co-conspirators, and the identities of all alleged co-conspirators. The defendant Reed argues that neither the indictment nor the discovery to date has provided him with this requested information and, specifically, how he is alleged to have participated in the conspiracy to possess pseudoephedrine.

The defendant Logan seeks a bill of particulars as to the conspiracies charged in counts one and three. In anticipation of the government's allegation of *Pinkerton* liability, the defendant wants to learn the identities of undisclosed and unidentified co-conspirators, aiders and abettors, and other individuals involved in the charged conspiracies. The defendant complains that the dates alleged in these counts are vague and too open-ended and create the potential for confusion. Finally, the defendant wants to know the particular quantity of drugs which he is alleged to have conspired to manufacture and possess and argues that the indictment is insufficient in notifying him only of a broad range of possible penalties.

An indictment is held only to minimal constitutional standards, and the sufficiency of an indictment is judged "by practical rather than technical considerations." *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir.1997). "An indictment is sufficient 'if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.'" *United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir.1991) (quoting *United States v. Staggs*, 881 F.2d 1527, 1530 (10th Cir.1989), *cert. denied*, 493 U.S. 1020, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990)). In the Tenth Circuit, it is usually enough for the indictment to track the statute when the statute adequately expresses all of the elements to the offense. *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir.1988).

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense." *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir.) (quotation omitted), *cert. denied*, 519 U.S. 901, 117 S.Ct. 253 (1996). It serves to minimize the defendant's sur-

prise to the substantive facts of the charges, not the evidentiary basis of the charge. *See Wong Tai v. United States,* 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927); *United States v. Hopkins,* 716 F.2d 739, 745 (10th Cir.1982). "Unless the request for the bill of particulars shows, on its face, that failure to grant the request would result in prejudicial surprise, the preclusion of an opportunity for meaningful defense preparation, [or double jeopardy problems,] defendant has the burden of showing [by brief, affidavit or otherwise] that his or her request meets one of the three criteria." *United States v. Anderson,* 31 F.Supp.2d 933, 938 (D.Kan. 1998) (citing *United States v. Wright,* 826 F.2d 938, 943 (10th Cir.1987) (citing in turn *United States v. Thevis,* 474 F.Supp. 117, 123–24 (N.D.Ga.1979), *aff'd,* 665 F.2d 616 (5th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982))), *reconsideration granted in part on other grounds,* 36 F.Supp.2d 1264 (D.Kan.1998). The district court has broad discretion in deciding a motion for bill of particulars. *United States v. Edmonson,* 962 F.2d 1535, 1541 (10th Cir.1992).

 In exercising its discretion, the trial court must remain mindful of the parameters placed on a bill of particulars. Though it may provide more information, a bill of particulars is not intended to serve as a discovery device or to compel the government's disclosure of the factual proof planned for trial. *United States v. Dunn,* 841 F.2d 1026, 1029 (10th Cir.1988). A defendant is not entitled to notice of "all the evidence the government intends to produce, but only the theory of the government's case." *United States v. Levine,* 983 F.2d 165, 167 (10th Cir.1992). Nor is it a way to require the government's explanation of the legal theories expected at trial. *United States v. Gabriel,* 715 F.2d 1447, 1449 (10th Cir.1983). Evidentiary detail is

not a proper request for a bill of particulars. *United States v. Barbieri,* 614 F.2d 715, 719 (10th Cir.1980). A bill of particulars is not required where the information necessary for one's defense can be obtained through some other satisfactory form. *See United States v. Canino,* 949 F.2d 928, 949 (7th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). Thus, a defendant's access to evidence is a factor to be considered. *See United States v. Kunzman,* 54 F.3d 1522, 1526 (10th Cir.1995).

 The indictment sets forth the essential elements of the conspiracy offenses charged and provides the defendants with minimal notice of the charges against which they must defend. The indictment generally alleges the timing of the conspiracies and sufficiently alleges the defendant co-conspirators involved, the location of the conspiracies, and their unlawful objects. The indictment specifies the concluding dates of the both alleged conspiracies, defines the nature of each conspiracy, describes the location of the conspiracy, names the co-conspirators, and identifies the specific controlled substance involved. An indictment for conspiracy to manufacture and distribute controlled substances "need not go further and allege 'in detail the factual proof that will be relied upon support the charges.'" *Dunn,* 841 F.2d at 1029 (quoting *United States v. Crippen,* 579 F.2d 340, 342 (5th Cir.1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979)). The omission of overt acts is not a deficiency, for "a conspiracy indictment under 21 U.S.C. § 846 need not allege any specific overt acts in furtherance of a conspiracy." *United States v. Brown,* 934 F.2d 886, 889 (7th Cir.1991). A general request for the overt acts seeks evidentiary material and is an improper discovery request. *United States v. Welch,* 198 F.R.D. 545, 550 (D.Utah 2001).

This is not to say that the court would be within its discretion to order the disclosure of this information if necessary to avoid unfair prejudice or surprise. *See United States v. Anderson*, 31 F.Supp.2d at 938. It is not necessary for a conviction that a conspirator " 'know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy [as long as he has] a general awareness of both the scope and the objective of the enterprise.' " *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir.1999) (quoting *United States v. Evans*, 970 F.2d 663, 669–70 (10th Cir.1992), *cert. denied*, 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993)), *cert. denied*, 530 U.S. 1231 (2000). The government is not obligated to provide information on unindicted coconspirators. *See United States v. Guebara*, 80 F.Supp.2d 1226, 1229 n. 3 (D.Kan.1999); *United States v. Villota–Gomez*, 994 F.Supp. 1322, 1335 (D.Kan.1998); *but see United States v. Anderson*, 31 F.Supp.2d at 938. The court is satisfied that the indictment here meets the minimal due process standards. Nonetheless, the court believes the moving defendants may be arguably prejudiced from the indefinite commencement date and vague drug quantity alleged in count one and the lack of a quantity allegation in count three. Other than these arguable deficiencies, the indictment is not so vague or incomplete as to prejudice the defendants in anticipating and preparing their defenses or in later asserting double jeopardy protection.

The government asserts that it has supplied the defendants with all reports from the investigative file, and these reports contain sufficient evidentiary detail for defendants to prepare their defenses, avoid surprise, and avoid being placed in double jeopardy. The government further represents that all the information the defendants seek from a bill of particulars has already been furnished in discovery. The government says it "knows of no supplemental or additional information that it has not already provided or agreed to provide in the future." (Dk.69, p. 45). The government offers its statement of facts on pages two through nine of its response (Dk.69) as a succinct statement of its allegations against the defendants in the event the court orders a bill of particulars. The court grants the defendants' motions insofar as it orders and accepts the government's cited statement of facts as the bill of particulars that addresses the questions on the timing of the conspiracies and the quantities of drugs or pseudoephedrine involved in the conspiracies. An additional bill of particulars is not required where, as here, the information necessary for one's defense can be obtained through some other satisfactory form. *See United States v. Canino*, 949 F.2d at 949. Accordingly, the defendants have not met their burden to show that failure to grant their request for an additional bill of particulars would result in prejudicial surprise, would preclude an opportunity for meaningful defense preparation, or would cause double jeopardy problems. The defendants' motions are granted insofar as the court accepts the government's statement of facts as a bill of particulars and are denied in all other respects.

## MOTION TO COMPEL DISCOVERY ON INFORMANT (Dk.62)

The defendant Logan seeks an order compelling the government to disclose the full name of confidential informant mentioned in the search warrant affidavit, the prior criminal record of the informant, any promises or agreements of immunity or other evidence going to the informant's bias or credibility, any payments or consideration given to the informant, any recorded memoranda of communications between the informant and government agents, the results of any polygraph examination, and

the extent of the informant's work in the investigation and the benefits received for that work. The defendant argues this information is needed to litigate the motion to suppress, because information from and about the informant is found in the search warrant affidavit. The defendant believes that the informant was Kim Evertson, who is now deceased, and that there is no longer any compelling reason for the government to withhold this information.

Relying on the law generally governing the disclosure of confidential informants, the government opposes disclosure arguing that the informant was a mere tipster, has limited information, was not present during the commission of the offense, and cannot provide any evidence that is exculpatory or not cumulative. The government maintains the defendant has not carried his burden of proving the evidence is relevant or essential to a fair determination of his case. Finally, the government believes the public policy favoring the confidentiality of informants dictates that the informant's identity here not be disclosed where the informant's testimony would have little value to the defendant. The government does not deny or confirm the defendant's statements that the informant is Kim Evertson or that the informant is dead.

In *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court recognized "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." This privilege is "by no means absolute." *United States v. Brodie,* 871 F.2d 125, 128 (D.C.Cir.1989). Whether to disclose the identity of a confidential police informant is a determination that requires a court to balance the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense. 353 U.S. at 62, 77 S.Ct. 623. In determining whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony. *Id.* "When it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure." *United States v. Martinez,* 979 F.2d 1424, 1429 (10th Cir.1992), *cert. denied,* 507 U.S. 1022, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993).

A defendant seeking disclosure has the burden of proof. *United States v. Sinclair,* 109 F.3d 1527, 1538 (10th Cir. 1997). The defendant must come forward with evidence establishing that the *Roviaro* criteria favor disclosure. *United States v. Blevins,* 960 F.2d 1252, 1258–59 (4th Cir.1992). Mere speculation about the usefulness of an informant's testimony is not sufficient to warrant disclosure. *United States v. Mendoza–Salgado,* 964 F.2d 993, 1001 (10th Cir.1992). " 'The defendant must explain to the court as precisely as possible what testimony he thinks the informer could give and how this testimony would be relevant to a material issue of guilt or innocence.' " *Blevins,* 960 F.2d at 1259 (quoting 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 510[06] (1991)); *see also United States v. Ridley,* 814 F.Supp. 992, 996 (D.Kan.1993).

This court recently held that when the informant is dead, any governmental privilege under *Roviaro* to withhold an informant's identity ceases to exist. *United States v. West,* No. 01–40122–SAC, 2002 WL 598338, at *2 (D.Kan. Mar. 18, 2002). If the defendant carries his burden of showing the informant is dead or the gov-

ernment concedes the same, then the government should be ordered to disclose the informant's identity. The defendant did not carry his burden of proving the informant mentioned in the affidavit is deceased. Nor did the defendant prove that the informant was more than a mere tipster and that the informant's testimony would be useful and valuable to the defendant at trial or the suppression hearing. The defendant's motion for disclosure is denied.

## REED'S MOTION TO SUPPRESS (Dk.53)

The defendant moves to suppress all statements he made as a result of law enforcement officer's interrogation. The defendant contends his statements were involuntary and obtained in violation of *Miranda.* The defendant argues that four armed officers in bullet-proof vests coming inside his house, conducting a protective sweep, and accusing him of having 1,500 boxes of pseudoephedrine was so intimidating and coercive as to create a custodial setting requiring a *Miranda* warning and, alternatively, to render involuntary all of his statements made during this encounter. The government denies that a custodial situation existed to require a *Miranda* warning and points to the defendant Reed's own conduct as showing his statement was voluntary.

In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." "It is well established that 'police officers are not required to administer *Miranda* warnings to everyone whom they question.'" *United*

*States v. Erving L.,* 147 F.3d 1240, 1246 (10th Cir.1998) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). There are two requirements that trigger *Miranda:* (1) "the suspect must be in 'custody,' and [ (2) ] the questioning must meet the legal definition of 'interrogation.'" *United States v. Ritchie,* 35 F.3d 1477, 1484 (10th Cir.1994) (quoting *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993)).

As soon as the suspect "has been deprived of his freedom of action in any significant way," *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, or has his freedom limited to a "degree associated with formal arrest," *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the suspect is considered to be in "custody." *United States v. Perdue,* 8 F.3d at 1463. The only relevant inquiry "is whether 'a reasonable [person] in the suspect's position would have understood his situation … as the functional equivalent of formal arrest.'" *United States v. Erving L.,* 147 F.3d at 1246 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). *"Berkemer's* 'reasonable person' does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." *United States v. Erving L,* 147 F.3d at 1247.

A defendant is not necessarily in custody simply because he is a suspect. *United States v. Cruz,* 838 F.Supp. 535, 542 (D.Utah 1993) (citing *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *United States v. Ellison,* 791 F.2d 821 (10th Cir.1986)). " '[C]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home." *United States v. Erving L,* 147 F.3d at 1247 (quoting *United States v.*

*Ritchie,* 35 F.3d at 1485). However, "custody" for *Miranda* purposes may occur in one's home if the suspect is subject to the functional equivalent of arrest. *United States v. Cruz,* 838 F.Supp. at 542.

■ Under the totality of circumstances, the court finds that the defendant Reed was not in police custody when questioned in his residence about the pseudoephedrine tablets. The defendant opened the door to two officers and implicitly allowed them inside for the stated purpose of discussing the recent criminal activity at Nic Logan's residence. While the officers may have been wearing bulletproof vests, they did not draw their weapons, did not handcuff the defendant, and did not otherwise physically restrain him. Agent Brandau did accuse the defendant of arranging a pseudoephedrine deal for Nic Logan, but there is no evidence suggesting that the agents' questioning was harassing, prolonged, coercive or threatening. The agents never told the defendant Reed that he was in police custody or was not free to leave. Though the agents made a protective sweep of the home, the agents did not make a showing of physical force or adopt a threatening posture against the defendant. Later while the agents searched the residence after receiving consent from the defendant's girlfriend, Agent Brandau further interviewed Reed outside in Brandau's unmarked pickup. The court infers no custodial setting to have resulted from this movement to the car outside. The evidence establishes that at no time during the encounter with the defendant did the officers use a threatening tone, physically restrain the defendant, threaten physical force, draw their weapons, or subject the defendant to intimidating or prolonged questioning. Additionally, the defendant appeared intelligent, coherent and able to understand what was happening. Under the totality of the circumstances, the officers' presence, actions and questions on January 14, 2002, did not curtail the defendant's freedom of action to the degree associated with formal arrest. For this reason, the agents did not violate *Miranda* in questioning the defendant Reed on that day.

■ Even when a defendant's *Miranda* rights are not violated, the court must still conduct a Fifth Amendment inquiry into the voluntariness of any statements. *United States v. Roman–Zarate,* 115 F.3d 778, 783 (10th Cir.1997). The court looks to the totality of the circumstances in determining whether the statements were voluntary. *United States v. Glover,* 104 F.3d 1570, 1579 (10th Cir. 1997). In considering whether a statement is of free will, the courts look to several factors, including: "(1) the characteristics of the defendant: age, education, intelligence, and physical and emotional attributes; (2) the circumstances surrounding the statement, including the length of detention and questioning and the location of questioning; and (3) the tactics, if any, employed by officers. (citations omitted). In no case, however, is any single factor determinative." *United States v. Chalan,* 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988). A confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause. *See Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473, (1986); *see United States v. Erving L.,* 147 F.3d at 1249. Absent evidence of coercion, a defendant's personal characteristics are

constitutionally irrelevant. *United States v. Erving L.,* 147 F.3d at 1249.

 Considering the totality of the circumstances, the agents' actions and words were not coercive. They did not use physical force, threatening words, or intimidating gestures. The defendant indicated his assent to speak with agents by walking inside after being asked to answer some questions about the crime at Nic Logan's residence. There is no evidence to suggest that the defendant ever voiced any objection to the agents' presence in the residence and their questions of him. The evidence shows the agents did not use psychological coercion or improper inducement such that the defendant's will was overborne. Indeed, the evidence establishes the defendant was able to exercise his free will in saying that he did not reside there and that he did not have the authority to consent to a search of the residence. The defendant's fortitude and free will was again displayed when he told Agent Brandau that he would not name the ostensible seller of the pseudoephedrine without an attorney. The court finds that the defendant Reed's statements were voluntarily given. The defendant Reed's motion to suppress is denied.

## DARNALL'S MOTION TO SUPPRESS EVIDENCE (Dk.57), LOGAN'S MOTION TO SUPPRESS STATEMENT (Dk.59), and LOGAN'S MOTION TO SUPPRESS EVIDENCE (Dk.60).

The defendant Darnall moves to suppress all evidence derived from the search of her residence and car and all statements she made to officers. The defendant contends the searches resulted from invalid third-party consent and the statements were involuntary and resulted from the illegal searches. The defendant Logan's moves to suppress his statements arguing they were not voluntary and were obtained in violation of his *Miranda* rights. He argues that when being transported home from the hospital he was in police custody. He also argues he was incapable of making a voluntary statement because he was in extreme pain and under the influence of medication. He contends the officers were aware of his condition and engaged in overreaching conduct to obtain his statements. The defendant Logan likewise challenges that his father did not have authority to consent to the search of his bedroom, that any consent obtained was done by deceit, and that officers had no reason to believe his father had this authority to consent. Without Agent Brandau's observations made during this unlawful search, the affidavit does not provide probable cause for a search warrant. Finally, the defendant Logan argues the vehicle was illegally seized and officers subsequently coerced his consent to search it.

The government responds that Hal Logan had apparent authority by virtue of his parental relationship to Nic Logan and by the absence of any other objective indications showing he lacked apparent authority. Specifically, the door to the bedroom was not locked, Nic Logan had no formal rental agreement with his father, he did not pay rent for the room, and Hal Logan testified he had the right to go into the bedroom and remove any illegal drugs. The government notes that nothing about Hal Logan's full and unconditional consent and the circumstances of the basement gave Agent Brandau any reason to doubt that he had permission to follow the trail of blood into the unlocked bedroom. The government denies that Hal Logan's consent was induced by fraud or deceit, as the officers testified that they went to Logan residence to investigate the aggravated battery. The government contends the officers lawfully seized the car as they had

probable cause to believe the car contained evidence of the aggravated battery and lawfully searched it after obtaining Nic Logan's consent. Lastly, the government insists both defendants gave voluntary statements to the officers.

### Search of the Defendants' Bedroom

The Fourth Amendment protects a citizen from unreasonable searches. "The consent of a third party to a search of common premises is effectual if the third party has either the actual authority or the apparent authority to consent to a search." *United States v. Gutierrez–Hermosillo,* 142 F.3d 1225, 1230 (10th Cir.) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)), *cert. denied,* 525 U.S. 900 (1998). The test for actual authority is "whether the third party has 'mutual use of the property, . . . generally has joint access or control for most purposes, . . . and whether the others have assumed the risk that one of their number might permit the common area to be searched.' " *Id.* (quoting *United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). The test for apparent authority is whether officers reasonably believed the person giving consent had authority to do so. *Id.* "The determination of the reasonableness of the officers' belief is an objective one: 'Would the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting party had authority over the premises?' " *Id.* (quoting *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793). "The government has the burden of proving the effectiveness of a third party's consent." *United States v. Salinas–Cano,* 959 F.2d 861, 864 (10th Cir.1992) (citations omitted). This "burden cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." *Salinas–Cano,* 959 F.2d at 864. However, "the Fourth Amendment does not invalidate warrantless searches based on a reasonable mistake of fact." *Id.* at 865 (quoting *United States v. Whitfield,* 939 F.2d 1071, 1074 (D.C.Cir.1991)).

The facts available to Agent Brandau on the morning of January 11, 2002, as outlined earlier in the order, would warrant a man of reasonable caution to believe that Hal Logan had authority over the entire residence and that he could authorize a lawful search of the same. Hal Logan was living at the house, invited the Detective Green inside, gave him permission to look anywhere he wanted, walked him around the upstairs, and even accompanied Detective Green downstairs where they observed the blood. When Agent Brandau arrived, Hal Logan repeated that the officers were free to look around and check out the residence. Mr. Logan did not place any qualifications on where the officers could look or what doors could be opened. Thus, Agent Brandau reasonably believed that Hal Logan owned the residence and that Mr. Logan had the authority to consent to a search of the entire residence, including the basement where blood had been found and also a bedroom to which the door was unlocked. Consequently, Agent Brandau's search of the bedroom was not unreasonable. *See Rodriguez,* 497 U.S. at 186–88, 110 S.Ct. 2793.

Besides attacking the authority of Hal Logan to give consent, the defendants also challenge the voluntariness of that consent. In deciding if the consent to search was free from coercion, the court looks at such factors as physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances. *United States v. Pena,* 143 F.3d 1363, 1367 (10th Cir.), *cert. denied,* 525

U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998). The defendants argues that the officers had an ulterior motive for searching the residence and that they used deception by not disclosing this motive in obtaining Hal Logan's consent. It is the defendant's burden to prove by clear and convincing evidence that Agent Brandau engaged in misconduct. *See United States v. Scarberry*, 208 F.3d 228, 2000 WL 235270, at *4 (10th Cir. Mar. 2, 2000) (Table) (citing *United States v. Powell*, 835 F.2d 1095, 1098 (5th Cir.1988)), *cert. denied*, 531 U.S. 847 (2000). However, this kind of deception cannot render consent involuntary because it makes the circumstances appear less coercive to Hal Logan, not more coercive. "An officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'" *United States v. Pena*, 143 F.3d at 1367 (quoting *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994)). In sum, the defendants have not proved any deception or coercion that would taint Hal Logan's consent.

The search warrant affidavit, in particular, the observations of Agent Brandau, provides probable cause. Even if probable cause did not exist, exclusion of the evidence is not appropriate, because the officers had acted in good faith in executing the warrant. *See generally United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon*, the Supreme Court held that when police officers act in good faith and reasonable reliance on a search warrant, the evidence obtained during the search should not be suppressed even if the warrant was lacking in probable cause. *See Leon*, 468 U.S. at 913, 104 S.Ct. 3430. If this court determines that the officers acted in good faith reliance on the search warrant, it

does not need to reach the issue of whether probable cause existed for the warrant. *See United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir.1993). There is a presumption that when an officer acts upon a search warrant the officer is acting in good faith. *See id.* at 1454.

The affidavit filed in support of the search warrant and the actual search warrant were sufficient to merit reasonable reliance by the police officers. The affidavit lists the items to be recovered, gives a detailed description of the address to be searched, briefly describes how defendant had been identified as a suspect based on information provided by a confidential informant shown to be reliable, and explains how some of the information given during these interviews had been verified. A police officer could reasonably rely on this search warrant. The defendant has produced no evidence indicating that the officers acted in bad faith or unreasonably relied on the warrant.

*Seizure of Car*

The defendants argue the officers acted unlawfully in seizing, impounding and searching their car parked in the hospital lot. The validity of impoundment is judged under Fourth Amendment reasonableness standards. *United States v. Haro–Salcedo*, 107 F.3d 769, 770–72 (10th Cir.1997). Police may impound cars when in the interest of public safety and when in performance of their community caretaking functions. *See South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). An impoundment comports with Fourth Amendment standards if done in the exercise of those functions or is otherwise supported by probable cause. *See United States v. Duguay*, 93 F.3d 346, 352 (7th Cir.1996) (citing *Opperman*, 428 U.S. at 370 n. 5, 96 S.Ct. 3092) ("An impoundment must either be

supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation."). The government bears the burden of proving the validity of an impoundment. *United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir.1992).

 The court finds that the officers had probable cause to believe the car contained evidence relevant to the battery. The officers could see blood covering the front passenger seat which evidenced the severity of Logan's injuries. Agents also were concerned whether any part of the aggravated battery took place inside the car and whether they would find there any evidence useful in identifying the assailants. "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir.1998), *cert. denied*, 526 U.S. 1078, 119 S.Ct. 1483, 143 L.Ed.2d 565 (1999). Thus, the officers lawfully seized the PT Cruiser in order to preserve the evidence within their plain view. In addition, the court concludes that Nic Logan

gave written voluntary consent for the officers to search the car.[1]

There was no evidence of duress or coercion used in obtaining that consent. The court's findings in the next section also sustain this conclusion of voluntary consent, and they are incorporated here by reference.

### Voluntariness of Statements

██ Rather than repeat the law governing this issue, the court refers back to its earlier discussion of the law used in deciding the defendant Reed's motion to suppress. Ms. Darnall argues she had been unlawfully seized and was in the custody of the Captain Carreno when she was being transported back to her residence. The evidence at the suppression hearing shows the contrary. The Captain offered Ms. Darnall a ride back to her residence after explaining that he first would need to escort the seized PT Cruiser for a distance. There is no evidence of coercion, duress or threats causing Ms. Darnall to accept Captain Carreno's offered ride. As Captain Carreno testified, Ms. Darnall could have requested at any point for Captain Carreno to pull over and let her out of the patrol car. The only reasonable inference from the evidence is that Ms. Darnall

---

1. A warrantless search is "per se unreasonable" unless one of the specifically established exceptions, like consent, is present. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (quotations omitted). Valid consent is that which is freely and voluntarily given. *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir.1999) (citation omitted). Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. at 227, 93 S.Ct. 2041. A court makes this determination without presuming the consent was voluntary or involuntary. *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir.1996). For this exception to apply, the government must prove by a preponderance of the evidence that consent was freely and voluntarily given. *United States v.*

*Soto*, 988 F.2d 1548, 1557 (10th Cir.1993). The government does not discharge its burden "by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The government first "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir.) (quoting *United States v. Angulo–Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)), *cert. denied*, 525 U.S. 903 (1998). The government also must prove that the officers used no implied or express duress or coercion in obtaining the consent. *Id.* This determination is made upon considering the totality of the circumstances. *Schneckloth*, 412 U.S. at 225–27, 93 S.Ct. 2041.

was always free to leave the patrol car. Nor does the court believe that a reasonable person in Ms. Darnall's position would have understood her situation to be the functional equivalent of a formal arrest. Even assuming one would find a custodial setting, Captain Carreno testified that before asking her specifically about the drug evidence found in her bedroom, he gave the *Miranda* warning to Ms. Darnall and had her execute a waiver of rights form. Ms. Darnall then wrote out a five-page statement including a diagram of the bedroom and its contents. The evidentiary record does not suggest any coercion, threats or duress being used against Ms. Darnall to compel this statement. The court finds that the Ms. Darnall voluntarily, knowingly and intelligently waived any rights under *Miranda* and gave a statement that was voluntary as judged by the totality of the circumstances.

 The defendant Nic Logan likewise argues he was seized at the hospital. The testimony of Agent Jorgensen establishes that he offered Nic Logan a ride home and Logan accepted it. There is no evidence that the agent ordered, commanded or directed Logan to get into the agent's car. Nor is there evidence to support the proposition that the defendant had no choice but to accept this ride after the officers had seized his car. Nothing prevented the defendant from telephoning his father, a friend or even a cab and obtaining a ride home or finding a place to stay temporarily. A reasonable person in Nic Logan's situation would not believe that he had been arrested after he accepts an agent's offer of a ride home. The court has no basis for concluding that this situation changed into a custodial setting simply because the officer takes a detour looking for the residence of someone who may have keys to the PT Cruiser. For that matter, when they reached Logan's home

and he joined his father in the living room along with Agents Brandau and Dixon, the defendant was not placed in a custodial setting. Nothing prevented Logan from leaving the house while officers executed the search warrant. A reasonable person in Logan's situation would not have believed he was under arrest at any of the relevant times on January 11, 2002, when officers were interacting and talking with Logan. In the absence of a custodial setting, a *Miranda* warning is not required.

 The defendant Logan next contends that his statements were involuntary because the officers observed he was in pain, knew he was under the influence of methamphetamine and pain medications, and continued their coercive interrogation of him. The law does not support the defendant's broad argument that the officer's knowledge of defendant's drug use should have led them to conclude that defendant was unable to give any statement voluntarily. The Tenth Circuit has summarized the relevant law in this way:

If "mental impairment ... should have reasonably been apparent to ... interrogators," then "a lesser quantum of coercion [will] render the confession involuntary." *United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir.1994); *see also Williams v. Collins*, 16 F.3d 626, 638 (5th Cir.) (noting as relevant to the petitioner's claim that his confession to police was involuntary, due to police coercion and to his "diminished capacity," that neither the police officers, who were experienced in detecting drug or alcohol usage, nor the petitioner's father, "testified that [the petitioner] appeared to be impaired in any way"), *cert. denied*, 512 U.S. 1289, 115 S.Ct. 42, 129 L.Ed.2d 937 (1994). However, even in such cases, for a confession to be involuntary, "the police must somehow overreach by exploiting a weakness or condition known to

exist." *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir.), *cert. denied*, 513 U.S. 906, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994); *see also United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993) (same).

*Nickel v. Hannigan*, 97 F.3d 403, 410 (10th Cir.1996), *cert. denied*, 520 U.S. 1106, 117 S.Ct. 1112, 137 L.Ed.2d 313 (1997). Under the law stated above, coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause. *See Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

The government has come forth with sufficient evidence to establish that the agents were not overreaching and did not exploit the defendant's physical or mental condition with coercive tactics. Although there is evidence that the defendant may have taken controlled substances a number of hours earlier and may have taken pain medication for his injuries, Logan still appeared to understand the questions and to be alert and coherent, was oriented to time and place, and was able to describe events sequentially and accurately. The agents did not use any trickery or deception in questioning Logan. Agent Brandau described Logan as cooperative and friendly. The evidence shows that Logan's ability to give voluntary statements was not impaired to the extent that he could not give a voluntary statement. *See Elliott v. Williams*, 248 F.3d 1205 (10th Cir.) (affirming court's determination that statement by defendant who had taken heroin was voluntary and admissible), *cert. denied*, 534 U.S. 927, 122 S.Ct. 286 (2001). The government has met its burden to show that defendant Logan's statements were the product of free and deliberate choice rather than intimidation, coercion, or deception.

IT IS THEREFORE ORDERED that defendant Bennie U. Reed's Motion for Bill of Particulars (Dk.51) and the defendant Nic T. Logan's Motion for Bill of Particulars (Dk.64) are granted insofar as the court orders and accepts the government's cited statement of facts as the bill of particulars that addresses the vague allegations of timing and quantity, and the motions are denied in all other respects;

IT IS FURTHER ORDERED defendant Bennie U. Reed's Motion to Suppress Evidence (Dk.53); the defendant Wendy Darnall's Motion to Suppress Evidence (Dk.57); and the defendant Nic T. Logan's Motion to Suppress Statement (Dk.59), Motion to Suppress Evidence (Dk.60), Motion to Compel Discovery Regarding Informant (Dk.62) are denied.