Filed 6/14/22  P. v. Flores CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075792 |
| v. | (Super.Ct.No. FWV19000341) |
| RIGOBERTO PEREZ FLORES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Kyle S. Brodie, Judge.  Vacated and remanded with directions.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

Following a second jury trial after the first ended in a mistrial, a jury convicted Rigoberto Perez Flores of two counts of aggravated sexual assault, oral copulation of his

son, who was under 14 years old. (Pen. Code, § 269, subd. (a)(4); unlabeled statutory references are to this code.) The first jury deadlocked on both counts. Flores was sentenced to 30 years to life in state prison.

On appeal, Flores argues that the trial court prejudicially erred by admitting his postarrest statements to law enforcement, which he claims were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) because he repeatedly invoked his right to remain silent. The People concede that Flores's fourth invocation was unequivocal and that the trial court therefore erred by admitting Flores's subsequent statements. The People argue that the error was not prejudicial.

We agree with the parties that Flores's fourth invocation of his right to remain silent was unequivocal. But we also agree with Flores that he unequivocally invoked his right to remain silent earlier in the interrogation, and we conclude that the error in admitting Flores's postarrest statements was not harmless beyond a reasonable doubt. We consequently vacate Flores's convictions and remand for further proceedings.[1]

---

[1] In a separate order filed concurrently with this opinion, we summarily deny Flores's petition for writ of habeas corpus. The issue raised in the habeas petition is rendered moot by our decision in this appeal.

BACKGROUND[2]

A. *The Eyewitness*

During the afternoon of November 11, 2018, Richard R. parked his car next to a four-door Nissan Altima in a public parking lot. The Nissan's rear windows were covered by sunshades that were not opaque, so Richard was able to see through them.

When Richard arrived, he noticed that there were people in the back seat of the Nissan. He noticed "[h]ead movement going up and down" near the "crotch area" of a seated man. Richard initially believed that a woman was performing oral sex on a man. Richard then exited his car and noticed "a little boy trying to climb into the front seat" from the back seat of the Nissan. The boy was the person Richard had seen moving his head up and down. The boy appeared to be Hispanic and eight to 10 years old, and he was wearing what Richard described as a blue and fluorescent green soccer uniform.

Richard later identified Flores as the man he saw that day, and John Doe as the boy he saw that day.

Richard testified that Flores, who remained seated in the back seat, pulled Doe back into the back seat. Flores first grabbed Doe by the back of Doe's neck and then by Doe's shorts.

After Flores pulled Doe into the back seat, Richard saw Flores "trying to force" Doe to "continue to perform oral sex" on Flores. Flores grabbed Doe "by his head and

---

**2**     Our summary of the facts is based on the evidence admitted at the second jury trial.

3

started forcing him toward his crotch area again." Flores forced Doe's head to move up and down into Flores's "crotch area."

The back seats in the Nissan appeared to be in their normal upright position and not folded forward. Richard did not observe either Flores or Doe lying down in the back seat.

Richard got back into the driver's seat of his car and used his phone to record video of the Nissan from inside his own car. The windows on both vehicles were rolled up. After Richard started recording, he noticed Doe again try to pull away from Flores and to climb into the front seat. Flores grabbed Doe's shorts and pulled Doe back toward him. Pulling the shorts stretched them so that Richard could see Doe's buttocks. Flores "tried to force—penetrate [Doe] from the little boy's rear." When Richard watched the recording later, he believed that he saw a silhouette of Flores's erect penis. Flores then grabbed an object that could have been a knife or a cell phone and put it "near [Doe's] throat." It looked to Richard as though Doe then "start[ed] to comply" with "whatever was going on" with Flores.

Richard gave the video recording to law enforcement. The recording was played for the jury. While the recording was being played, the prosecutor paused it to allow Richard to describe what he saw. The glare on the Nissan's window makes it difficult to discern much of anything in the recording aside from movement inside of the car. Richard explained that toward the end of the recording the sunshade on the driver's side rear window fell, but Doe put it back in place. Richard admitted that at most shadowy

4

silhouettes were apparent in the recording and that it was not possible to see a "clear picture" of Flores in the recording.

Richard stopped recording when it appeared that someone in the back seat of the Nissan had noticed him. After he stopped recording, Richard got out of his vehicle and walked toward the front of his vehicle. Richard saw Flores take off his clothes, grab a cloth, and wipe off his entire body, including his "crotch area." Flores placed all of the removed clothes in a black garbage bag and got dressed in different clothes. Doe had climbed into the front seat before Flores started removing his clothing. Doe looked at Richard more than once, and Richard believed that Doe looked confused. Doe put his head down and scratched the back of his head.

Flores exited the Nissan, got into the driver's seat, and drove off. Flores never made eye contact with Richard, but Richard saw Flores's face.

Richard texted his wife and told her what had happened and the license plate number of the Nissan, and he sent her the video recording. Richard asked his wife to contact law enforcement, which she did.

The 911 dispatcher asked Richard's wife for Richard's contact information and called Richard. That call was recorded. A recording of that call and the transcript were admitted into evidence. Richard told the dispatcher that he had seen a Hispanic male approximately 40 to 50 years old in the back seat of a car with a Hispanic boy who was approximately nine to 10 years old and wearing a fluorescent green shirt. Richard said that when he pulled into the parking space, he saw the man make the boy "suck his"

5

"penis." Richard also said that it appeared that the man attempted "to force him like to, to, to intercourse." Richard said that the man had the boy "pinned down." When the man noticed that Richard was parked next to him, Richard described the man as getting "nervous," so the man "made the kid jump in the front seat" and "the man started getting dressed and stuff."

Richard had not wanted to contact law enforcement himself because he had a prior criminal history and an open criminal case pending against him involving a charge of felony assault with a deadly weapon. Richard admitted that he had lied multiple times to law enforcement concerning that open case. Richard had previously been convicted of felony first degree burglary and misdemeanor hit and run. At trial, Richard was in custody for a pending criminal case based on an incident that occurred after November 11, 2018. He faced a charge of felony child endangerment causing bodily injury.

Later on the day of the incident, Officer Buddy Porch of the City of Fontana Police Department and other law enforcement officers interviewed Richard at his home. Richard was initially nervous while speaking with Porch. Porch testified that the statement Richard gave to law enforcement that day was consistent with Richard's testimony at trial, except that the day of the incident Richard did not claim that Flores attempted to penetrate Doe anally. Porch observed Richard's testimony under oath twice at prior proceedings about the incident and believed that Richard's prior testimony was consistent with his trial testimony.

B. *Doe's Testimony*

The prosecution called Doe as a witness. Doe was 13 years old when he testified.

In November 2018, Doe's mother and father were not living together. Doe lived with his mother, and he saw his father almost weekly.

On the day of the incident, Doe and his father attended church, went to the swap meet, and then went to the movies. They also went to a park. Flores was driving the same car that Richard identified.

At the park, Flores parked in a parking lot and rested in the front seat of the car. Flores closed his eyes and partially reclined the front seat. Flores then moved into the back seat to rest. According to Doe, Flores folded the back seat forward, toward the front passenger seat, and then lay down with his legs resting in the trunk. Flores had a pillow and two blankets, one he was lying on and one that was covering him. Flores was in the back seat between 10 and 30 minutes.

At first, Doe was seated in the front passenger seat watching YouTube videos on his father's cell phone. After his father had been in the back seat for approximately 10 minutes, Doe moved to the back seat because Doe got tired. His father pulled down the back seat behind the driver's seat so that Doe could lie down. Doe lay down with his feet in the trunk and his head toward the driver's seat. Doe believed that he was lying in the back seat with his father for around 30 minutes. Doe did not fall asleep. He rested and watched videos on YouTube. The rear passenger window had a screen to block the sun.

7

When Doe was in the front passenger seat, he noticed a car parked next to the passenger side of his father's car. Doe also noticed a man walking toward that car. Another man was seated inside the car. Just before Flores and Doe left the parking lot, the man inside the car exited, and the two men stood near the other car smoking. Neither man was holding a phone.

Flores and Doe got out of the car while it was light outside. Flores returned the back seats to their normal position, Flores and Doe got into the front seats, and Flores drove away.

Flores drove Doe home directly from the park. According to Doe's mother, Doe arrived home around 5:00 p.m. or 6:00 p.m. Doe's mother said that Doe was wearing sweat pants and a green shirt from an after-school program.

C. *Law Enforcement Interview of Doe*

At approximately 10:00 p.m. that night, law enforcement officers arrived at Doe's home. Doe was asleep, so his mother woke him up. Porch interviewed Doe. Doe was 12 years old. Officer Edward Bautista also was present and spoke with Doe's mother in Spanish. Doe's sister arrived during the interview. A portion of the contact between Bautista and Doe's mother was recorded. Porch's interview of Doe was recorded. The interview with Doe was played for the jury. Transcripts of the recorded interviews, with English translations of any Spanish spoken, were admitted into evidence.

8

Porch asked Doe what had happened earlier that day at the park. Doe said that his father was sleeping while Doe was watching YouTube. Doe added that his father had "pulled the—the back like the bed."

Porch told Doe that someone at the park had seen what was happening in the car and recorded it. Doe initially stated that the person did not see what was happening. Once Porch told him that there was a recording, Doe insisted that nothing had happened. Doe repeatedly stated that "[i]t was just a misunderstanding." Doe could not articulate what constituted the misunderstanding. Doe cried and said that he did not need any help. Doe said, "we didn't do anything wrong." Doe vomited during the interview and explained that he has anxiety attacks. Doe asked Porch not to harm his father.

D. *Law Enforcement Interview of Flores*

While law enforcement officers were at Doe's home, Doe's mother contacted Flores to ask him what was happening. Flores arrived at the residence in his brother's truck and told an officer that he owned a Nissan Altima, which was parked at his brother's home.

Flores was arrested and transported to the police station, where Porch and Bautista interviewed him. Flores indicated that he spoke some English but not a lot. Bautista was present at the beginning and the end of the interview. Bautista spoke to Flores in Spanish and translated Flores's responses for Porch. Flores also spoke to Porch directly in English. Porch interviewed Flores both before and after a nurse conducted a physical examination of Flores.

During the prosecution's case-in-chief, video recordings of those interviews were played for the jury. Transcripts of those interviews, with the Spanish translated into English, also were admitted into evidence.

In the first interview, Porch informed Flores that a man had recorded Flores and his son in the back seat of the car earlier that day. Flores initially said that he had just been lying down in the park. He then said that he was lying down with Doe and explained that Doe's head was on his arm. Flores denied that Doe's head had been in his lap and said he did not remember Doe putting his mouth on Flores's penis. Flores also denied remembering what had happened.

Porch asked Flores, "All I need to know is one thing. Did it happen less than five times or more than five times? That's all I need to know." Flores responded, "Less than one, ah, five times." Porch then asked if it was "just the mouth or was it the butt," to which Flores responded, "I don't know what to tell you." Flores then said that it happened "less than one" and that he had just been "trying to sleep." Flores then reverted to saying that he did not remember putting his penis in his son's mouth and that he did not know if he did it.

Porch gave Flores a pen and paper to write a letter to Doe. The letter was admitted into evidence during the prosecution's case-in-chief. Flores wrote: "To whom it may concern, I'm sorry, my son [Doe], if I hurt you. I'm sorry I abused you, my son. I am sorry for tonight. I just—just thought something bad happened to you and I ran fast to

10

your home from the swap me [*sic*].  Good night, *hijo*.  I love you a lot.  God bless you always.  Your dad."

A nurse then conducted a physical examination of Flores.  The nurse informed Porch that during the examination, she discovered tissue paper wrapped around an open sore on Flores's penis.

After the examination, Porch interviewed Flores again and told Flores that the nurse had found genital warts on his penis.  Porch told Flores that Doe could have warts too if Flores's penis had touched Doe.  Porch asked Flores whether his penis had touched Doe's mouth alone or also his buttocks, so that Porch would know which part of Doe's body to test.  Flores responded, "Oh, test him."  Porch asked for clarification of "[w]hich one" to test.  Flores's first response to the question is disputed.  Porch repeated the question, and Flores responded, "His—his mouth."  Porch asked Flores if he needed to test Doe's buttocks, and Flores responded, "No."

E.  *Forensic Interview of Doe*

Several days after the incident, a forensic interviewer interviewed Doe.  The interview was recorded, and the recording was played for the jury.  A transcript of the interview also was admitted and provided to the jury.

Doe told the interviewer that on Sunday his father picked him up, they attended church, ate food next to the church, and went to the movies, and "then after that we like—we were tired, so we got out of the car, then we went to the park."  He explained that the car's back seats fold down into a bed.  Doe was watching YouTube videos on his

11

father's phone, and his father "was just moving around trying to get to sleep." Doe explained that he "didn't see the car on the left, 'cause the seat was down, and I couldn't see anything out the window above, so I didn't know that guy was there." His father was lying on his side while Doe was in the back seat with him. Doe stopped watching videos and "just hugged" his father. Doe tried to sleep but could not, so his father told Doe to relax at home with his mother.

Doe returned to the car's front seat while his father folded the blankets that he had put down so that the metal from the back seat would not hurt Doe. His father then returned to the front seat, which is when Doe noticed "the guy." That person "put down his window, then he just started like to stare at [Doe] for like 15 seconds before he just stopped." Doe's father then started the car, and Doe noticed "another guy" head toward the other car, where both men "just started smoking." His father took him home, and the police arrived later that night while he was asleep to question him about what happened.

Doe explained that when the police were questioning him, he had an anxiety attack, which he typically experiences when he is "nervous" or does not "know what's happening." Doe explained that his anxiety attack affected the police officer as follows: The police officer "thought that, 'cause when [Doe] was doing the anxiety attack, that it was like because of what [his father] did to [him], which [his father] never did anything to [Doe]." Doe explained that the police interviewed him because the man parked next to his father's car had called 911. Doe believed the police questioned him because they

thought that his father had done something "harmful" to Doe even though "nothing happened." He explained that "like, a lot of these accusations happen all the time."

Doe believed that the man who had recorded him and his father believed that something had happened because of the position he and his father were in while they were in the back seat. Doe was lying down on his back, and his father was moving around because he was trying to sleep. Then, Doe's father "just started hugging [Doe] after a while, and then yeah, hugging [Doe], and [Doe] hugged [his father] back, because [they] do that, 'cause it's father and son, [they] hug each other," which Doe described as "regular family stuff" which makes him feel "[s]afe" and not "uncomfortable."

The interviewer told Doe that his father had spoken to law enforcement and "told them everything that happened," and Doe responded, "Yeah," and "And what." Doe insisted that he too had told the interviewer everything that had happened "from [his] point of view."

Doe knew that his father was in custody and believed it was unfair because law enforcement never showed Doe the recording. Doe said that his mother and siblings all believed him. Doe hoped that through the forensic interview, his voice would be "heard, so like it helps out [his] dad." Doe denied that anyone had ever "done touching" to his body or asked him to touch their body.

The interviewer described Doe as answering some questions abruptly and not providing answers to any questions asking for emotional responses. In the interviewer's experience, Doe's demeanor answering questions regarding topics other than abuse was

13

not typical. Children are generally more relaxed during the rapport-building phase of the interview.

F. *The Car*

Detective Luis Valenzuela of the City of Fontana Police Department located Flores's Nissan Altima at an automobile auction company in Fontana, California. There was a removable shade on the interior of the rear passenger window.

Valenzuela folded the back seats down, but it was not easy to do. He was not able to do it on his first attempt. It required depressing a button on the seat and simultaneously using a key. It took two people, and one person pushed down on the seat from outside the car.

Valenzuela, who is about five feet nine inches tall and weighs 185 pounds, lay down on the back passenger seat with the seat folded down and his feet inside the car's trunk. Lying in that position was not comfortable, and Valenzuela did not believe that he would have been able to sleep comfortably in that position. There was an approximate two-inch gap between the top level of the back seats and the trunk's floorboard, which made lying down on his back or his side uncomfortable. The top portion of the folded back seats was made of hard material and did not have cushions. There were metal clips at the top of the folded down back seats. With his head at the very top portion of the folded back seat, Valenzuela could not fully stretch out his legs.

14

G. *Flores's Testimony*

Flores testified on his own behalf. On November 11, 2018, Flores picked up Doe in the morning. They ate donuts, attended church, ate at church, went to the swap meet, and went to the movies. After the movies, Doe told Flores that he did not want to go home and instead wanted to spend more time with Flores, so Flores took Doe to a park. They arrived at the park at approximately 2:00 p.m. and played for a little while at the park. They went back to the car because the winds were strong.

Flores and Doe relaxed in the car's front seats for about 10 minutes. Flores then moved to the back seat of the car to take a nap, which he did. He "pushed the back of the seat to the front" on the right side, where he then lay down. Flores had blankets with him in the back seat. When he was taken into custody, Flores was approximately five feet seven inches tall and weighed 200 pounds.

Doe initially remained in the front passenger seat watching videos on Flores's cell phone. Doe then asked Flores if he could join Flores in the back seat. Flores "move[d] the other side down" for Doe to lie down behind the driver's seat. Doe continued to watch videos on Flores's phone. Flores and Doe were in the back seat for a little longer than 10 minutes. Doe's mother called Flores's phone, so Flores then decided to take Doe home to his mother's house.

Flores denied ever inappropriately touching his son, putting his penis in Doe's mouth, or attempting to put his penis in Doe's buttocks. As to the day at the park, Flores specifically denied that he put his penis in Doe's mouth or attempted to put his penis in

15

Doe's mouth or buttocks. Flores denied touching Doe "in any kind of sexual manner" or doing anything inappropriate with Doe while they were in the car. He also denied putting a knife or any object up against Doe's neck. Flores denied taking off his clothes in the car and wiping down his body.

When Porch interviewed Flores, Flores answered Porch's question about the number of times he put his penis in Doe's mouth by stating that it had happened fewer than five times because he "couldn't answer something differently, that was the option that [Porch] gave" him. When Porch asked Flores whether they should test Doe's mouth or buttocks, Flores answered that they should test Doe's mouth because he did not want them to check Doe's anus. The nurse examined Flores while he was naked, and he "didn't want them to do the same thing" to his son.

DISCUSSION

Flores argues that the trial court prejudicially erred by admitting his postarrest statements to law enforcement because law enforcement officers violated his rights under *Miranda* by continuing to question him after he unequivocally invoked his right to remain silent four times during the interrogation. The People concede that the fourth invocation was unequivocal and that the trial court therefore erred by admitting Flores's subsequent statements. But the People argue that the error was harmless beyond a reasonable doubt. We agree that the fourth invocation was unequivocal. We also conclude that Flores had previously unequivocally invoked the right to remain silent immediately after being advised of his *Miranda* rights. The trial court consequently erred

16

by admitting everything that Flores said thereafter.  We further conclude that the error was not harmless beyond a reasonable doubt.

A.  *Applicable Law*

"Under *Miranda*, police officers must warn a suspect before questioning that he or she has the right to remain silent and the right to the presence of an attorney.  [Citation.]  'Once warnings have been given, the subsequent procedure is clear.  If the individual indicates . . . that he wishes to remain silent, the interrogation must cease.'  [Citation.]  To end the interrogation, the suspect must invoke the right to silence unambiguously.  'If an accused makes a statement . . . "that is ambiguous or equivocal" or makes no statement, the police are not required to end the interrogation, [citation], or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights [citation].'  [Citation.]  But if the defendant 'articulate[s] his desire . . . sufficiently clearly that a reasonable police officer in the circumstances would understand' it as a request to terminate the interrogation, the request must be honored."  (*People v. Case* (2018) 5 Cal.5th 1, 20 (*Case*); *People v. Flores* (2020) 9 Cal.5th 371, 417.)  When a defendant has already waived his or her *Miranda* rights and agreed to talk with law enforcement, "any *subsequent* invocation of . . . the right to remain silent must be unequivocal and unambiguous."  (*People v. Sanchez* (2019) 7 Cal.5th 14, 49.)  A confession obtained in violation of *Miranda* may not be introduced into evidence during the prosecution's case-in-chief.  (*People v. Hoyt* (2020) 8 Cal.5th 892, 931.)

"We review *Miranda* claims under federal constitutional standards." (*People v. Johnson* (2022) 12 Cal.5th 544, 578.) On review of the trial court's ruling about whether a defendant has invoked his or her right to remain silent, "'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.'" (*Case*, *supra*, 5 Cal.5th at p. 20.) When, "as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

B. *Relevant Proceedings*

Before the second trial, Flores moved to suppress the postarrest statements he made to law enforcement on the ground that the statements were obtained in violation of *Miranda* and the Fifth Amendment.[3] Flores did not specify the basis of his *Miranda* challenge in the motion. The People opposed the motion and attached a transcript of the initial portion of Flores's interrogation (before the physical examination) to the opposition. No party introduced any other evidence on the motion.

---

[3] Flores had unsuccessfully moved to suppress his postarrest statements before the first trial. On appeal, Flores supports his argument about the motion made before the second trial by citing the motion filed before the first trial and the trial court proceedings for that motion. The parties do not contend that in the second trial, the court adopted its ruling from the first trial. We are reviewing the ruling on the motion made at the start of the second trial, so we rely exclusively on the proceedings from that motion.

18

At a hearing on the motion, Flores argued that he had made several unequivocal invocations of the right to remain silent as he was being advised of his *Miranda* rights and immediately thereafter.[4] (At the hearing, defense counsel did not numerically list the invocations, as Flores does on appeal, but the arguments concerned the first three invocations that Flores has identified on appeal.) The People argued that the invocations were conditional and therefore equivocal.

The transcript reflects that Bautista began advising Flores in Spanish of his *Miranda* rights as follows:

"OFFICER BAUTISTA: [In Spanish] Okay, listen. You—you have the right to remain silent. Do you understand?

"DEFENDANT: [In Spanish] Well yes. *But I want to remain silent because I don't know why you're arresting me.*" (Italics added.)

Bautista did not respond to Flores's comment and instead continued advising Flores in Spanish of the remainder of his *Miranda* rights. Flores acknowledged in Spanish that he understood each of those rights. Immediately after Flores said that he understood all of his rights, the following exchange occurred, with Bautista and Flores speaking in Spanish and Porch interjecting in English:

"OFFICER BAUTISTA: [In Spanish] Do you want to talk about what happened?

"DEFENDANT: [In Spanish] Pardon?

---

**4**    In the trial court, Flores argued that his postarrest statements should be excluded for additional reasons. But he does not raise those arguments on appeal.

19

"OFFICER BAUTISTA:  [In Spanish]  Do you want to talk about—about what happened?

"DEFENDANT:  [In Spanish]  About what happened?

"OFFICER PORCH:  Sign saying that we read your Miranda rights.

"DEFENDANT:  [In English]  I don't know.  [In Spanish]  *No, I don't want to talk because I don't know what you're accusing me of.*

"OFFICER BAUTISTA:  [In Spanish]  I want to tell you.

"DEFENDANT:  [In Spanish]  Pardon?

"OFFICER BAUTISTA:  [In Spanish]  I'm going to tell you.

"DEFENDANT:  [In Spanish]  *But they didn't tell me.  I don't want to talk yet.*

"OFFICER PORCH:  What's he saying?

"OFFICER BAUTISTA:  That I don't want to talk.

"DEFENDANT:  [In Spanish]  You didn't tell me my rights, you didn't tell me what you were accusing me of.

"OFFICER BAUTISTA:  [In Spanish]  These are your rights.

"OFFICER PORCH:  He doesn't walk [*sic*] to talk already?  I thought you just wanted to talk?  You don't want to talk?

"DEFENDANT:  You—you want me to tell you something that I don't know what you're arresting me?

"OFFICER PORCH:  Well, okay.  Listen.

"DEFENDANT:  I don't know what to tell you.

20

"OFFICER PORCH:  Okay, we can talk.  You've started talking to me, so now we can legally talk."  (Italics added.)

After Porch told Flores that the officers could legally speak with him, Porch explained that he was questioning Flores for the following reason:  "It's simple.  Your car today—the guy standing next to your car had a cell phone like this.  Recorded you and your son in the back seat.  I have it on camera."  Flores asked "what happened," and Porch responded, "You know what happened.  So, you can sit here and lie to me all you want, and I've got a video."

The interrogation then continued for 10 more minutes before Flores again invoked his right to remain silent.  During those 10 minutes, Porch asked Flores if Flores had put his penis in Doe's mouth more or less than five times, to which Flores responded, "Less than one, ah, five times."  Flores also repeatedly stated that he could not remember whether he had put his penis in his son's mouth earlier that day.

In a subsequent exchange with Porch, Flores again invoked his right to remain silent as follows:

"DEFENDANT:  No, that's what you're telling me.  That's what you're telling me you saw in the video.  I don't—I don't remember that guy doing a video—a video taping.

"OFFICER PORCH:  Yeah, he was video taping.

"DEFENDANT:  He was in—he was in the car.

"OFFICER PORCH:  He wasn't in the car, he was outside the car.

21

"DEFENDANT: When I saw him, he was in the car. When we got out. When we—when we leave. . .

"OFFICER PORCH: When you got out of the car and you stood up, you looked right at him. It's all on video, bro.

"DEFENDANT: Yeah, I know. You're telling me it's on video now. *Yeah, I'm here, really I don't want to talk anymore.*

"OFFICER PORCH: Okay, I'll just put down that you said it happened less than five times. You're not—you're not as sure if you put your penis in your son's mouth.

"DEFENDANT: I'm not sure, no. I don't remember. You're saying that you got me, you got me, you got me already. I don't remember doing it." (Italics added, underlining omitted.)

Shortly after that exchange, Porch left Flores in the interrogation room with a pen and paper, and then the nurse physically examined Flores. After the physical examination, Porch told Flores that Flores had genital warts, and Flores eventually told Porch that he should test Doe's mouth and not his buttocks. Flores also wrote Doe the apology letter after the fourth alleged invocation.

The trial court concluded that there was no *Miranda* violation after the fourth invocation because "[t]he interrogation functionally [did] cease." The court explained that Porch's statements after Flores invoked his right to remain silent were merely a description of what Porch intended to do next, which the trial court concluded was not prohibited by *Miranda*. Because Flores chose to start speaking again, the court reasoned

22

that there had been no *Miranda* violation.  The trial court did not otherwise make any express ruling about the other three claimed invocations.

The trial court did, however, express concern that the apology letter written after the fourth invocation was the product of coercion.  After hearing argument on the issue, the court concluded that the letter was coerced, and the court granted Flores's motion to exclude it.[5]  The court otherwise denied Flores's motion to suppress.

## C.  Miranda *Violations*

The People concede that Flores's fourth invocation—"Yeah, I'm here, really I don't want to talk anymore,"—was unequivocal, so the trial court erred by admitting Flores's statements made thereafter.  We agree.  The interrogation should have immediately ceased because Flores unequivocally invoked his right to remain silent under *Miranda*.  (*Miranda*, *supra*, 384 U.S. at pp. 473-474; *Case*, *supra*, 5 Cal.5th at p. 20.)  We agree with the People's concession that the trial court erred by concluding that the interrogation did "functionally" cease at that time.  Under *Miranda*, the term interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. omitted; *People v. Sims*

---

**5**    During trial, defense counsel made a tactical decision to introduce the letter. Counsel explained that he preferred admission of the letter (which he did not believe amounted to a confession) to redaction of any portion of the forensic interview of Doe (which mentioned the letter).  The trial court granted the request, and  the letter was admitted during Porch's testimony in the prosecution's case-in-chief.

(1993) 5 Cal.4th 405, 440.)  Porch's statements that Flores was not sure whether he had put his penis in Doe's mouth and that Flores had said it happened fewer than five times were reasonably likely to elicit incriminating responses and were not merely innocent comments attendant to arrest and custody.

In addition, we agree with Flores that at least his third invocation of his right to remain silent was sufficiently unequivocal and unambiguous that interrogation should have ceased at that time.  Flores said in Spanish, "But they didn't tell me.  I don't want to talk yet."  Porch then asked Bautista in English, "What's he saying?"  Bautista answered in English, "That I don't want to talk."  There was then a brief exchange between Flores and Bautista in Spanish, which Bautista did not translate (and with which we do not take issue), and Porch then resumed interrogating Flores.  Thus, having been informed that Flores said "I don't want to talk," and having been provided with no further statements from Flores, Porch continued interrogating Flores.  That violated Flores's *Miranda* rights.  There is nothing equivocal or ambiguous about "I don't want to talk."

The People argue that Bautista's translation was "incomplete," so in light of Flores's subsequent exchange with Bautista in Spanish "and [Flores's] earlier equivocal invocations," it was appropriate for Porch to clarify whether Flores was willing to talk. We do not agree.

In determining whether Flores unequivocally invoked his right to remain silent, we ask "what a reasonable officer in the circumstances would have understood [the] defendant to be saying." (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1126.)  Because

24

Porch, not Bautista, continued interrogating Flores after Flores's third invocation of his right to remain silent, we must determine what a reasonable officer in Porch's position would have understood Flores to be saying. At that point, Porch had been told that Flores said, "I don't want to talk." Again, there is nothing equivocal or ambiguous about "I don't want to talk." A reasonable officer in Porch's position would have understood that Flores had invoked his right to remain silent. And contrary to the People's argument, because Flores's invocation as it was conveyed to Porch was not ambiguous, Porch could not seek any clarification from Flores about his willingness to talk. (*Case*, *supra*, 5 Cal.5th at p. 20.) Porch therefore violated Flores's *Miranda* rights when he continued questioning Flores by seeking to clarify whether Flores was willing to talk. The trial court consequently erred by admitting Flores's subsequent statements to law enforcement. Because that invocation was made immediately after Flores was advised of his *Miranda* rights, all of Flores's postarrest statements should have been excluded.[6]

D. *Prejudice*

"'The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, . . . . That test requires the People . . . "to prove beyond a reasonable doubt that the error complained of did not contribute to the

---

[6]     Between the first and third invocations, Flores made no statements other than acknowledging that he understood his *Miranda* rights and saying that he had not been told the accusations against him. Because we conclude that the third invocation was unequivocal and unambiguous and because that invocation occurred immediately after the other two claimed invocations, we need not and do not decide whether Flores's first two invocations were equivocal.

25

verdict obtained."'" (*Case*, *supra*, 5 Cal.5th at p. 22.) In other words, in applying the *Chapman* standard, we must determine "'whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.'" (*People v. Canizales* (2019) 7 Cal.5th 591, 615.) Reversal is required if there is "'a reasonable possibility'" that the error may have contributed to the verdict. (*Chapman v. California*, *supra*, at p. 24.)

On this record, we cannot conclude that the erroneous admission of Flores's postarrest statements was harmless beyond a reasonable doubt. First, Flores's statements were highly inculpatory. He said that he could not remember whether he had put his penis in his son's mouth, that it had happened fewer than five times, and that the police should test his son's mouth but not his buttocks for a possible infection from Flores's penis. "A confession is uniquely powerful evidence" (*People v. Bradford* (2008) 169 Cal.App.4th 843, 855), and Flores's postarrest statements were no exception. Second, the prosecutor relied on that evidence in closing argument, which by itself tends to show that admission of the evidence was prejudicial. (*People v. Powell* (1967) 67 Cal.2d 32, 55.) Third, the evidence of guilt was not overwhelming. The video did not show anything, so the case ultimately turned on the credibility of Richard, the sole eyewitness. Richard had no apparent motive to lie, but his credibility was not unimpeachable. On the contrary, because of his criminal history, he did not call 911 himself but had his wife do it because he thought he would not be believed. Fourth, the victim, Doe, consistently denied that Flores did anything inappropriate to him. And fifth, the jury at the first trial deadlocked

26

on all charges, even though Flores's postarrest statements were admitted at that trial as well.

For all of the foregoing reasons, we cannot agree with the People's argument that any error was harmless beyond a reasonable doubt because Flores's statements to law enforcement were not "actually inculpatory" and "there was overwhelming evidence of [Flores's] guilt." "[W]e cannot say that the confessions were 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" (*People v. Neal* (2003) 31 Cal.4th 63, 87.) "Nor can we say that the 'verdict actually rendered in this *trial* was surely unattributable' to the" statements. (*Ibid.*, quoting *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) We consequently cannot conclude that the erroneous admission of Flores's statements to law enforcement was harmless beyond a reasonable doubt.

## DISPOSITION

We vacate the two aggravated sexual assault convictions and remand for further proceedings consistent with this opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.


We concur:

FIELDS

Acting P. J.

RAPHAEL

J.

27